**ORIGINAL**



FILED

MAR 29 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**Harry J. Williby**
P.O. Box 990755
Redding,CA 96099-0755
Phone: (000) 000-0000
E-mail: wilabee@protonmail.com
Attorney for: In Pro Se

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO



**Harry J. Williby,**

    **Plaintiff,**

v.

**Sergey Brin,**
**Larry Page,**
**Pichai Sundararajan, a.k.a., Sundar**
**Pichai, his predecessor,**
**Eric Schmidt, dba, Alphabet, Inc.,**
**Google, LLC., and YouTube, LLC., dba,**
**Blogger, dba, Google AdSense**
**(Pay-Per-Click)**
**Mark Zuckerberg, dba,**
**Facebook, Inc.,**
**Jeff Bezos, dba,**
**Amazon.com, Inc., and**
**Doe(s)/Roe(s) 1-10,**

    **Defendants.**

CV21    **2210**

CASE NO.

**COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................. 1

II. NATURE OF THE ACTION ............................................................... 2

III. PARTIES ......................................................................................... 17

IV. JURISDICTION AND VENUE ……........................................................ 22

V.  INTRADISTRICT ASSIGNMENT ............................................... 23

VI. THE RELEVANT MARKET  ........................................................ 23

VII.        FACTUAL ALLEGATIONS ............................................. 24

        A. Background ................................................................. 24

          1.  Plaintiff's Decade of Serving AdSpend/Adsense & Marketing YouTube!.................................................................... 24

          2.  The inextricably intertwined relevant market and relevant product …………………………………………………………….... 33

          3. The Defendants Complete Market Power Over online, digital Advertising ......................………….................................. 34

      B. The Monopolistic horizontal price fixing scheme ..................... 41

        4.   The Defendants have acquired An Advertising "Monopoly by Acquisition(s)." ...................................................................... 43

        A.   The Defendants have divisely purchased all of competitive online digital advertising companies under a Horizontal Market Agreement .. 43

        B.   The Google "AdSense" (pay-per-click) "horizontal price fixing scheme" And the Acquired Advertising Monopoly has and Continues to Net the Defendants Trillions of Dollars ................................................ 49

        5.   The Defendants have jointly conspired to engage in unlawful

anti-competitive conduct from 1998 -to - Present ............................... 55

A.   The "Obama Phone" (UMX U686CL) .................................... 55

B.   The Anti-Competitive Android Operating System ................. 56

C.   Twitter and the Unlawful Conspiracy to Engage in Unlawful,
     Anti-Competitive Conduct ........................................................ 58

D.   The Obama Administration, the UMX U686CL (Android
     OS) and the "Cloud-based" Conspiracy to Engage in
     Unlawful, Anti-Competitive Conduct ................................ 60

E.   The Obama and the Biden  Administrations Are "Unnamed
     Conspirators in the Defendants' Conspiracy to Engage in
     Unlawful, Anti-Competitive Conduct ................................... 73

6. The Defendants have jointly conspired with mainstream
media and movie outlets to engage in unlawful anti-competitive
conduct on the YouTube Website ....................................... 75, 76

A.     YouTube's Background ................................. 76

B.     The YouTube AdSpend/Adsense Conspiracy
To Mislead Plaintiff As A Content Creator/Website
Designer .................................................................... 78

C.     The Relevant Market Applicable To
Defendants' Misconduct .......................................... 90

D.     Defendants' Conduct Has Injured Competition
................................................................................... 93

E.      Defendants' Anticompetitive Conduct Has

Injured Plaintiff ........................................................ 94

VIII.   THE NEED FOR PRELIMINARY RELIEF ............................................................. 95

IX. CAUSES OF ACTION ............................................................................................. 97

COUNT I: Violation of the Sherman Act (15 U.S.C. § 1) Shadow Banning:

Damages/Disgorgement ……………………………………………………...…………….... 97

COUNT II: Violation of the Sherman Act (15 U.S.C. § 1) Demonetization:

Damages/Disgorgement ........................................................................................... 100

COUNT III: Violation of the Sherman Act (15 U.S.C. § 1) Channel Termination:

Damages/Disgorgement ...................................................................................... 102, 103

COUNT IV: Violation of the Sherman Act (15 U.S.C. § 1) Price Fixing:

Damages/Disgorgement ........................................................................................... 105

COUNT V: Violation of the Sherman Act (15 U.S.C. § 1) Exclusive Dealing and Other

Exclusionary Agreements:  Equitable Relief ......................................................... 108

COUNT VI: Violation of the Sherman Act (15 U.S.C. §§ 1, 2) Unlawful Tying:

Equitable Relief ...................................................................................................... 109

COUNT VII: Violation of the Sherman Act (15 U.S.C. § 1) Horizontal Market-Division

Agreements: Equitable Relief ................................................................................ 110

COUNT VIII: Violation of the Sherman Act (15 U.S.C. § 1) Declaratory Relief .................... 112

COUNT IX: Violation of the Sherman Act (15 U.S.C. § 2) Conspiracy to Monopolize: Equitable

Relief ...................................................................................................................... 115

COUNT X: Violation of the Sherman Act (15 U.S.C. § 2) Monopolization: Equitable Relief .......................................................................................................................................... 120

COUNT XI: Violation of the Lanham Act (15 U.S.C. § 1125(a)) False descriptions: Damages/Disgorgement ............................................................................................. 121

COUNT XII: Violation of the Lanham Act (15 U.S.C. § 1125(a)) False Advertising: Damages/Disgorgement ............................................................................................. 122

COUNT XIII: Violation of the Lanham Act (15 U.S.C. § 1125(a)) False Advertising: Damages/Disgorgement ............................................................................................. 124

COUNT XIV: Breach of Contract (Cal. Civ. Code § 3300): Damages .................................... 127

COUNT XV: Fraud: Damages ................................................................................................... 128

COUNT XVI: Negligent Misrepresentation: Damages ............................................................ 130

COUNT XVII: Breach Of Implied-In-Fact-Contract: Damages ............................................... 131

COUNT XVIII: Breach Of Implied-Covenant of Good Faith & Fair Dealing: Damages ....... 133

COUNT XIX: Unfair Competition, Cal. Bus. & Prof. Code §17200: Damages ...................... 135

COUNT XX: Conversion: Damages ......................................................................................... 136

COUNT XXI: Quantum Meruit Restitution .............................................................................. 137

COUNT XXII: Unjust Enrichment Under California Law: Damages/Disgorgement ............. 140

X. PRAYER FOR RELIEF ........................................................................................................ 142

XI. DEMAND FOR JURY TRIAL ........................................................................................... 156

Harry J. Williby
P.O. Box 990755
Redding,CA 96099-0755
Phone: (000) 000-0000 (cell phone users can be tracked by defendants' Android OS)
E-mail: wilabee@protonmail.com
Attorney for: In Pro Se

**ORIGINAL** **UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO**

| | |
|---|---|
| **Harry J. Williby,** | Case No. |
| **Plaintiff,** | |
| **vs.** | |
| | **COMPLAINT FOR DAMAGES** |
| **Sergey Brin,** | **JURY TRIAL DEMANDED** |
| **Larry Page,** | |
| **Pichai Sundararajan, a.k.a.,** | |
| **Sundar Pichai, his predecessor,** | |
| **Eric Schmidt, dba, Alphabet,** | |
| **Inc.,** | |
| **Google, LLC., and YouTube,** | |
| **LLC., dba, Blogger, dba,** | |
| **Google AdSense** | |
| **(Pay-Per-Click)** | |
| **Mark Zuckerberg, dba,** | |
| **Facebook, Inc.,** | |
| **Jeff Bezos, dba,** | |
| **Amazon.com, Inc., and** | |
| **Doe(s)/Roe(s) 1-10,** | |
| **Defendant(s).** | |

## I.    INTRODUCTION

The Plaintiff, Harry J. Williby ("Williby" or "Plaintiff"), by and through its

attorneys, (In Pro Se), as and for its complaint against Defendants Sergey Brin, Larry

Page, Sundar Pichai, his predecessor, Eric Schmidt, dba, Alphabet, Inc., Google, LLC., and YouTube, LLC., dba, Blogger, dba, Google AdSense (Pay-Per-Click), Mark Zuckerberg, dba, Facebook, Inc., Jeff Bezos, dba, Amazon.com, Inc., and Doe(s)/Roe(s) 1-10, allege as follows:

## II.    NATURE OF THE ACTION

1.    This is an action under Sections 1 and 2 of the Sherman Act to restrain anticompetitive conduct by the defendants, the world's largest providers of the Android OS, Google Apps, Google Search browser, Internet advertising, online sales, and online news feed, and to remedy the effects of their past unlawful conduct. Defendants' actions, conduct and agreements are restraints of trade that are per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. and § 2. This is also an action for damages and other relief arising out of the Defendants' unlawful and unfair decision to deprive Plaintiff of earned Internet Advertising Revenue. Defendants' actions, conduct and agreements are restraints of trade that are per se unlawful and constitute false advertising under the Lanham Act, 15 U.S. Code § 1125(a)(1)(A) and (B). The Plaintiff seeks an order prohibiting such actions, conduct and agreements.

2.    Since 2003, Defendants have tightly limited the supply and territorial markets of online advertisement in the United States and around the world, through its Google "AdSense (PPC)" program. Defendants have also collectively controlled and dictated under what terms and conditions, the website owners, or content creators, such as the Plaintiff, can have an online, digital advertising presence. This is achieved through a process commonly referred to by Defendants as "Demonetization," or "Shadow

Banning." This is not a fair process in a competitive marketplace. It is a horizontal price-fixing scheme-rigged process that, contrary to the law, promotes a monopoly in order to further line the pockets of the Alphabet Defendants (owners) jointly and severally, with billions of dollars paid by their billionaire competitors (Defendants Facebook and Amazon) to the sole detriment of the Plaintiff, website owners, content creators and consumers. The Google "AdSense (PPC)" program is, essentially, a leveraging of the Defendants Android operating system and Internet browser monopoly power, used to extract value from Plaintiff, website owners, content creators and consumers, through a scheme-rigged process.

3.      The costs of Defendants' collective scheme is enormous, particularly to the public who bear the brunt of Defendants' anti-competitive conduct. Due to the great demand for online advertisement, on the one hand, and Defendants' collective market power over the online, digital advertising industry, on the other, Defendants can demand supra-competitive terms to the detriment of Plaintiff and consumers. This is a case of leveraging monopoly power, resulting in an anticompetitive wealth transfer from consumers to private business, in violation of the antitrust laws.

4.      Not only does the Google "AdSense (PPC)" program violate the antitrust laws, the federal courts have previously determined the terms & conditions of the program to be procedurally and substantively unconscionable.  *In Free Range Content, Inc, v. Google Inc.*, No. 5:14-cv-02329 (BLF) *Plaintiffs challenged the "Terms and Conditions" of the Google AdSense Program as unconscionable. The court held: "Thus, the Court finds that Plaintiffs have sufficiently alleged at least a degree of procedural*

unconscionability. *See Bridge Fund, 622 F.3d at 1004. (At page 12) [¶] [...] the Court finds that Plaintiffs have sufficiently alleged substantive unconscionability." (At Page 14.)* Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)" <u>alone,</u> determines the terms & conditions of the Google "AdSense (PPC)."

5.      Specifically, the Defendants, jointly and severally, controls all browsers, operating systems, online sales and online digital advertising; collectively, they control the terms & conditions, which Plaintiff, as the host of multiple websites, is an intended beneficiary; Defendants control who can place online ads;  the number of advertisements that can be placed online (or on a particular page); where the ads are located online; and the cost of these online ads, which gives them complete market control and power. Through this decidedly skewed process, Defendants concertedly refused to deal with Plaintiff. As a result of Defendants' anti-competitive conduct, jointly and severally, the Defendants (during the operative times of this complaint) have shared, or will share, in more than ***$1.4 Trillion*** in online, digital advertising revenue. Maximizing their cartel revenue – ultimately at the expense of the consuming public and Plaintiff – is what really matters to Defendants.

6.      The Defendants' unlawful conduct has caused Plaintiff significant injury and loss. Among other things, Plaintiff has lost the value of his significant ten year investment in the websites/pages set forth below in ¶ 52. Plaintiff is burdened with a brand (Wilabee, (derivative brand of Williby)) of significantly diminished value, and has lost the revenues generated by the ten year investment in the websites/pages set forth

below in ¶ 52. Defendants disregarded every objective factor in the destruction, shadow banning and demonetization of Plaintiff's websites/pages set forth below in ¶ 52. Thus, concertedly demonetizing, shadow banning and refusing to deal with Plaintiff on objective terms in an effort to maximize their ad revenue, as well as leveraging their multi-market monopoly power, was not grounded on, or based upon any objective criteria. Because Defendants' collective action was not grounded in objective criteria and violates the law, their collective action lacks any procompetitive justifications.

7.      The Defendants, jointly and severally, possesses (and for several years has possessed) monopoly power in the market for browsers, online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones and mobile based operating systems. Defendants' "Android" operating systems are used on over 98% of cell phones, the dominant type of cell phones in the United States. More than 90% of new cell phones are shipped with a version of Android apps pre-installed. Cell Phone manufacturers (often referred to as Original Equipment Manufacturers, or "OEMs") have no commercially reasonable alternative to Android operating systems for the cell phones, tablets, or wearables that they distribute.

8.      There are high barriers to entry in the market for browsers, the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones and mobile based operating systems. One of the most important barriers to entry is the barrier created by the number of software applications that must run on an operating system in order to make the operating system attractive to end users. Because end users want a large number of applications available, because most applications today are

written to run on Android, and because it would be prohibitively difficult, time-consuming, and expensive to create an alternative operating system that would run the programs that run on Android, a potential new operating system entrant faces a high barrier to successful entry and thus cannot develop browsers, platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones, or mobile based operating systems.

9.     Accordingly, the most significant potential threat to the Defendants' operating system monopoly is not from a direct, frontal assault by existing or new operating systems, but from new software products that may support, or themselves become, alternative "platforms" to which applications can be written, and which can be used in conjunction with multiple operating systems, including but not limited to Android.

10.    To protect its valuable Android monopoly against such potential competitive threats, and to extend its operating system monopoly into other software markets, The Defendants, jointly and severally, have engaged in a series of anticompetitive activities. The Defendants' conduct includes agreements tying other software products to the Android operating system; exclusionary agreements precluding companies from distributing, promoting, buying, or using products of Android's software competitors or potential competitors; and exclusionary agreements restricting the right of companies to provide services or resources to Android's software competitors or potential competitors.

11.    One important current source of potential competition for Android's operating system monopoly comes from the Internet. The development of competing

Internet browsers -- specialized software programs that allow PC users to locate, access, display, and manipulate content and applications located on the Internet's World Wide Web ("the web") -- posed a serious potential threat to Android's operating system monopoly.

12.   Internet browsers pose a competitive threat to Android's operating system monopoly in two basic ways. First, as discussed above, one of the most important barriers to the entry and expansion of potential competitors to the Defendants in supplying platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones, or mobile based operating systems, is the large number of software applications that will run on the Android operating system, but not on other operating systems. If application programs could be written to run on multiple operating systems, competition in the market for platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, PC/tablets/smartphones, or mobile based operating systems could be revitalized. For example, a programming language can be designed in part to permit applications written in it to be run on different operating systems, other than Android. As such, it threatens to reduce or eliminate one of the key barriers to entry protecting Android's operating system monopoly.

13.   Internet browsers are perhaps the most significant vehicle for distribution of platforms for the online sale of goods, payment systems, Internet advertising, online news feeds, to end users. The Defendants have recognized that the widespread use of browsers, other than their own, threatens to increase the distribution of platforms for the online sale

of goods, payment systems, Internet advertising, online news feeds, and in so doing threatens Defendants' Android operating system monopoly. Second, the Defendants recognized that a browser was itself a "platform" to which many applications were being written -- and to which (if it thrived) more and more applications would be written. For example, since a java supported browser could be run on any PC operating system, the success of this alternative platform threatened to reduce or eliminate a key barrier protecting Defendants' Android operating system monopoly. Therefore, for example, when we load a website or a web service in which Java technology is used, it shows a message saying: "The [Google] Chrome browser does not support Java." The reason is that the [Google] Chrome browser no longer supports the NPAPI. NPAPI is a technology that supports Java applets.

14.     To respond to the competitive threat posed by browsers not owned, or controlled by the Defendants, Defendant Google embarked on an extensive campaign to acquire, market and distribute Defendants' own mobile based Internet browser, which is named "Android."

15.     Due to Defendants' vast resources and programming technology, Defendant Google was well positioned to develop and market a mobile based browser in competition with Internet OS platforms. Indeed, continued competition on the merits between Internet OS platforms and Defendant's Android OS would have resulted in greater innovation and the development of better products at lower prices. Moreover, in the absence of the Defendants anticompetitive conduct, the offsetting advantages of Facebook, Amazon and Google's size and dominant positions in OS software and the

Internet OS platform's position as the browser innovator and the leading distribution browser supplier, and the benefit to consumers of product differentiation, could have been expected to sustain competition on the merits between these companies, and perhaps others that have entered and might enter the OS market.

16.     However, the Defendants Facebook, Amazon and Google have not been willing simply to compete on the merits. The Defendants have concluded that it would be very hard to increase browser share on the merits of Android alone. It will be more important to leverage the OS asset to make people use Android instead of the Internet based platforms. Thus, the Defendants Facebook, Amazon and Google began, and continues today, a pattern of anticompetitive practices designed to thwart OS and browser competition on the merits, to deprive customers of a choice between alternative browsers, or operating systems, and to exclude the Defendants' Internet browser and/or OS competitors.

17.     The Defendants' conduct with respect to Internet browsers and operating systems is a prominent and immediate example of the pattern of anticompetitive practices undertaken by the Defendants, jointly and severally, with the purpose and effect of maintaining its Android operating system monopoly and extending that monopoly to other related markets.

18.     The Defendants have clearly adapted the anticompetitive mantra of the former monopolistic giant Microsoft. In a warning to competitive rivals in June 1996, the Microsoft CEO stated: "*We are going to cut off their air supply. Everything they're selling, we're going to give away for free. Our business model works even if all Internet*

*software is free. . . . We are still selling operating systems.*" First, Google has invested eighty ($80) billion dollars to develop, test, and promote the Android OS, a product which it distributes without separate charge. Second, the Defendants have set about to exclude non-Android and other Internet browser rivals from access to the distribution, promotion, and resources they need to offer their browser products to OEMs and PC/tablets/smartphones users. This prevents rival browsers from becoming an attractive programming platform in their own right. Third, the Defendants Facebook, Amazon and Google did not stop at free distribution. Rather, the Defendants purposefully set out to do whatever it took to make sure significant market participants distributed and used the Android OS instead of the Internet browser -- including paying some customers to take the Android OS and using its unique control over Facebook, Amazon and Google Apps (supported only by Android OS) to induce others to do so. For example, virtually every cell phone manufacturer (globally) has installed the Android OS on their phones, while every U.S. (Android) wireless phone retailer has agreed to pre-install Facebook, Amazon and Google (Android based) Apps on their phones.

19.    The Defendants unlawfully required PC/tablets/smartphones manufacturers, as a condition of obtaining licenses for the Android operating system, to agree to license, preinstall, and distribute Android on every phone and the Google browser on every PC/tablets/smartphones such manufacturers shipped. By virtue of the monopoly position Android enjoys, it was a commercial necessity for OEMs to preinstall the Android OS -- and, as a result of Google's illegal tie-in, the Google search browser -- on virtually all of the PC/tablets/smartphones they sold. Google thereby unlawfully tied its Internet

Browser software to the Android version of its monopoly operating system and unlawfully leveraged its operating system monopoly to require PC/tablet/smartphone manufacturers to license and distribute the Google search browser on every PC/tablet/smartphone those OEMs shipped with Google (Android based) applications. The Defendants, Facebook, Amazon and Google have made it clear, that unless restrained, they will continue to misuse their operating system monopoly to artificially exclude browser/OS competition and deprive customers of a free choice between browsers/OS.

20.    Internet browsers are separate products competing in a separate product market from PC/tablets/smartphones and operating systems, and it is efficient to supply the products separately. Indeed, Defendant Google itself has consistently offered, promoted, and distributed its Internet browser as a stand-alone product separate from, and not as a component of, Android, and intends to continue to do so. Defendant Google's tying of its Internet browser to its monopoly operating system reduces the ability of customers to choose among competing browser products because it forces OEMs and other purchasers to license or acquire the tied combination whether they want Google's Internet browser or not. Defendant Google's tying -- which it can accomplish because of its monopoly power in Android OS -- impairs the ability of its browser rivals to compete to have their browsers preinstalled by OEMs on new PC/tablets/smartphones and thus substantially forecloses those rivals from an important channel of browser, or PC/tablet/smartphone operating system distribution.

21.    Defendant Google's executives have repeatedly recognized the significant

advantage that Google (and the other Defendants) receives by tying its Internet browser to its operating system, rather than having to compete on the merits. Google has misused, and continues to misuse, its Android operating system monopoly by requiring PC/tablet/smartphone OEMs to agree, as a condition of acquiring a license to the Android operating system, to adopt the uniform "boot-up" sequence and "desktop" screen specified by Google. This sequence determines the screens that every user sees upon turning on a PC/tablet/smartphone. Google's exclusionary restrictions forbid, among other things, any changes by an OEM that would remove from the PC/tablet/smartphone any part of Google's Internet browser software (or any other Google-dictated software) or that would add to the PC/tablet/smartphone becoming a competing browser (or other competing software) in any more prominent or visible way (including by highlighting as part of the startup sequence or by more prominent placement on the desktop screen) than the way Google requires its Internet browser to be presented.

22.     Virtually every new PC/tablet/smartphone that comes with Android, no matter which OEM has built it, presents users with the same screens and software specified by Google. As a result of Google's restrictive boot-up and desktop screen agreements, OEMs are deprived of the freedom to make competitive choices about which browser or other software product should be offered to their customers, the ability to determine for themselves the design and configuration of the initial screens displayed on the phones, or computers they sell, and the ability to differentiate their products to serve their perceptions of consumers' needs.

23.     These restrictive agreements also maintain, and enhance the importance of,

Google's ability to provide preferential placement on the desktop (or in the boot-up sequence) to various Internet Service Providers ("ISPs") and Internet Content Providers ("ICPs"), in return for those firms' commitments to give preferential distribution and promotion to the Google Internet browser and to restrict their distribution and promotion of competing browsers. As a result, these restrictions further exclude competing Internet browsers from the most important channels of distribution, substantially reduce OEMs' incentives and abilities to innovate and differentiate their products in ways that could facilitate competition between Google products and competing software products, and enhance Google's ability to use the near-ubiquity of its Android operating system monopoly to gain dominance in both the Internet browser/OS, the online sale of goods, payment systems, Internet advertising, PC/tablet/smartphone and the online news feeds market as well as other software markets.

24.     The Defendants have entered into anticompetitive agreements with virtually all of the nation's largest and most popular ISPs, including particularly Online Service Providers ("OLSs"), firms which provide the communications link between a subscriber's PC, Cell Phone and the Internet and sometimes related services and content as well. Defendants Facebook, Amazon and Google provide PC/tablet/smartphone users with "folders" or lists including the names of certain of these ISPs that have entered into agreements with the Defendants and enable users readily to subscribe to their services. Because Google is preinstalled on nearly all PC/tablets/smartphones in the United States, inclusion in these folders and lists is of substantial value to ISPs. As a result, almost all of the largest and most significant ISPs in the United States have sought placement on the

Google desktop.

25.     Defendant Google's agreements with ISPs allow Google to leverage its Android operating system monopoly by conditioning these ISPs' inclusion in Googles' lists on such ISPs' agreement to offer Google's browser primarily or exclusively as the browser they distribute; not to promote or even mention to any of their subscribers the existence, availability, or compatibility of a competing Internet browser; and to use on their own Internet sites Google-specific programming extensions and tools that make those sites look better when viewed through Android, or the Google browser than when viewed through competing mobile operating systems, or Internet browsers. Defendant Google's anticompetitive agreements with ISPs have substantially foreclosed competing OS/browsers from this major channel of OS/browser distribution. Over ninety percent of Internet browser/OS users have obtained their browsers/OS from ISPs.

26.     Google has entered into anti competitive agreements with Internet Content Providers ("ICPs"). Prominent "channel buttons," advertising and providing direct Internet access to select ICPs appear on the "Active Desktop" feature that is shipped with the Android operating system. Defendant Google's agreements condition an ICP's placement on one of these buttons on the ICP's agreement to not pay or otherwise compensate Defendant Google's primary Internet browser/OS competitors (including by distributing their browsers/OS) for the distribution, marketing, or promotion of the ICP's content; to not promote any browser produced by any of Defendant Google's primary browser/OS competitors; to not allow any of Defendant Google's primary browser/OS competitors to promote and highlight the ICP's "channel" content on, or for their

OS/browsers; and to design its web sites using Google-specific, proprietary programming extensions so that those sites look better when viewed with Google's Internet browser/OS than when viewed through a competing browser/OS. These illegal agreements further inhibit competition on the merits between Google's Internet browser/OS and other OS/Internet browsers.

27.   Neither the antitrust laws nor this action seeks to inhibit Defendants Facebook, Amazon and Google from competing on the merits by innovation or otherwise. Rather, the Complaint challenges only Defendants Facebook, Amazon and Google concerted attempts to maintain its monopoly in operating systems, Internet search browsers and digital advertising to achieve dominance in other markets, not by innovation and other competition on the merits, but by tie-ins, exclusive dealing contracts, and other anti competitive agreements that deter innovation, exclude competition, and rob customers of their right to choose among competing alternatives.

28.   Facebook, Amazon and Google's conduct adversely affects innovation, including by:

   a. impairing the incentive of Facebook, Amazon and Google's competitors and potential competitors to undertake research and development, because they know that one, or all of the Defendants will be able to limit the rewards from any resulting innovation;

   b. impairing the ability of Facebook, Amazon and Google's competitors and potential competitors to obtain financing for research and development;

   c. inhibiting Facebook, Amazon and Google's competitors that nevertheless

succeed in developing promising innovations from effectively marketing their improved products to customers;

d. reducing the incentive and ability of OEMs to innovate and differentiate their products in ways that would appeal to customers; and

e. reducing competition and the spur to innovation by Facebook, Amazon, Google and others that only competition can provide.

29. The purpose and effect of Facebook, Amazon, Google's conduct with respect to Internet browsers, the Android OS, have been and, if not restrained, will be:

a. to preclude competition on the merits between Google's browser and other browsers;

b. to preclude potential competition with Google's Android operating system from competing browsers and from other companies and software whose use is facilitated by these browsers;

c. to extend Google's Android operating system monopoly to the Internet browser market; and

d. to maintain Google's Android operating system monopoly.

30. Accordingly, Plaintiff now brings this action explicitly for preliminary and permanent injunctive relief, and demonstrates that Defendants' conduct constitutes clear violations of Sections 1 and 2 of the Sherman Act (breach of contract, breach of covenant & good faith and unfair competition, among other claims) and will cause irreparable injury in the absence of preliminary relief. As demonstrated in more detail below, because of this unlawful conduct, Plaintiff is entitled to, among other remedies, treble

damages from Defendants under 15 U.S.C. §§ 1 and 15; a disgorgement of the enormous supra-competitive profits that Defendants have received, and will receive, from their unlawful conduct; and damages for Defendants' breach of their own contract, to which Plaintiff, as the online web host of tens of thousands of Google "AdSense (PPC)" advertisements, was an intended beneficiary.

## III.   PARTIES

31.   Plaintiff, during the operative times of this complaint, was a resident of the City of Oakland and operated as a sole proprietorship, located in California. Oakland, as an content creator, website designer,  independent advertiser, ad server and owner of the websites/pages set forth below in ¶ 52, at which the Defendants, jointly and severally, currently serve and host Google "AdSense (PPC)" online advertisements.

32.   Defendant Alphabet Holding Corporation (hereafter "Alphabet") was created by Law as a private legal entity, for profit, and with "general corporate powers," under the Delaware General Corporation Law (where Alphabet is incorporated). Alphabet is an American multinational conglomerate headquartered in Mountain View, California 94043, at 1600 Amphitheatre Parkway (County of Santa Clara). Alphabet, Inc. was created through a corporate restructuring of Google on October 2, 2015. Alphabet, Inc. became the parent company of Google and several former Google subsidiaries. Alphabet Inc., is thus a legal entity doing business as (hereafter, "dba") Google, Inc., dba, Blogger, dba, Google AdSense (PPC) and dba, YouTube, LLC." Shares of Google's stock have been converted into Alphabet stock, which trades under Google's former ticker symbols of "GOOG" and "GOOGL". Google's core businesses are its search engine and

advertising sales through its global AdSense (PPC) program. Alphabet is essentially a holding company for Google, as well as all the projects, ideas, capital investments, and subsidiaries that Google has acquired over the years. The company consists of Google as well as other businesses including X Development, Calico, Nest, Verily, Fiber, Makani, CapitalG, and GV. As per its 2017 annual report, 86% of Alphabet's revenues came from performance advertising (through user clicks using AdSense and Google Ads) and brand advertising. Of these, 53% came from its international operations. This translated to a total revenue of US$110,855 million in 2017 and a net income of US$12,662 million. On January 16, 2020, Alphabet became the fourth US company to reach a **US$1 trillion dollar market value,** entering the trillion dollar companies club for the first time.

33.    Defendant Larry Page co-founded Google. Defendant Page was the CEO of Alphabet, Inc., for the period covering October 2, 2015 to 2018. From September 4, 1998 to October 2, 2015, Page served as CEO of Google. Defendant Page remains at Alphabet as co-founder, controlling shareholder, board member, and employee. As of November 2020, Defendant Page was the 13th-richest person in the world, with a net worth of **US$77.6 billion dollars.**

34.    Defendant Sergey Mikhaylovich Brin co-founded Google. Defendant Brin was the president of Google's parent company, Alphabet Inc., until stepping down from the role on December 3, 2019. Defendant Brin remains at Alphabet as co-founder, controlling shareholder, board member, and employee. As of September 2020, Defendant Brin is the 7th-richest person in the world, with an estimated net worth of **US$63.9 billion dollars.**

35.     Defendant Eric Emerson Schmidt was the Executive Chairman of Google from 2001 to 2015 and Alphabet Inc. from 2015 to 2017. From 2001 to 2011, Schmidt served as the CEO of Google. Defendant Schmidt served as a Technical Advisor for Alphabet, until February 2020.  As of November 13, 2020, Defendant Schmidt had an estimated net worth of **US$16.9 billion dollars**. Defendant Schmidt recently obtained citizenship in the European island, Cyprus, which could allow him to legally avoid paying U.S. taxes on his $17 billion fortune

36.     Defendant Sundar Pichai (his full name is Pichai Sundararajan) was the chief product officer of Google, Inc., for the period covering October 2, 2015 to 2018. Defendant Pichai, Product Chief, became the new CEO of Google, replacing Defendant Page, who transitioned to the role of running Alphabet, along with Google co-founder, Defendant Brin. Defendant Pichai's net worth in 2020 is estimated at between **US$600 million dollars and US$1.2 billion dollars**.

37.     Defendant Facebook, Inc. is a California corporation that was founded in 2004, by Defendant Mark Zuckerberg. Defendant Facebook's Headquarters is located at 1 Hacker Way, Menlo Park, California 94025. Facebook Inc. (FB) is the largest social networking site in the world with 2.5 billion monthly active users (MAUs) as of year-end 2019. Facebook also owns and operates the popular photo-sharing app Instagram as well as messaging apps Messenger and WhatsApp. The company provides virtual-reality hardware, software, and a developer ecosystem through its Oculus business. Facebook went public in 2012 and has become one of the world's largest companies with a market capitalization of **US$507.92 billion dollars** as of April 14, 2020. Facebook earned net

income of **US$18.5 billion dollars on US$70.7 billion dollars** of revenue during fiscal year 2019 (FY).

38.      Defendant Mark Zuckerberg is the co-founder, chairman and CEO of Facebook, Inc. Defendant Zuckerberg co-founded Facebook, Inc., in 2004, with three fellow classmates at Harvard University at the time. Defendant Zuckerberg is responsible for setting the overall direction and product strategy for the company. He leads the design of Defendant Facebook Inc.'s service and development of its core technology and infrastructure. As the Chief Executive Officer, Defendant Zuckerberg is responsible for enforcing the acts, policies, practices, and/or customs of Defendant Facebook, Inc. Defendant Zuckerberg is Facebook's largest shareholder by far. He currently holds over 400 million shares of Facebook, comprising a market value of around **US$82.2 billion**. Zuckerberg's holdings also give him a disproportionate share of voting rights. He controls 57.9% of the total voting shares, giving him effective control of the company.

39.      Defendant Amazon.com, Inc. engages in the retail sale of consumer products and subscriptions in North America and internationally. It operates through the North America, International, and Amazon Web Services (AWS) segments. The company sells merchandise and content purchased for resale from vendors, as well as those offered by third-party sellers through retail Websites, such as amazon.com, amazon.ca, amazon.com.mx, amazon.com.au, amazon.com.br, amazon.cn, amazon.fr, amazon.de, amazon.in, amazon.it, amazon.co.jp, amazon.nl, amazon.es, and amazon.co.uk. It also manufactures and sells electronic devices, including kindle e-readers, fire tablets, fire TVs, and echo; and provides Kindle Direct Publishing, an online service that allows

independent authors and publishers to make their books available in the Kindle Store. Defendant Amazon.Com, Inc., is currently the world's largest online sales company, the largest Internet company by revenue, and the world's largest provider of virtual assistants and cloud infrastructure services through its Amazon Web Services branch. Amazon's net worth as of November 11, 2020, is more **US$1.7 trillion dollars,** making it the second-most valuable company in the U.S., trailing only Apple.

40. Defendant Jeff Bezos founded Amazon in late 1994. Bezos founded the aerospace manufacturer and sub-orbital spaceflight services company Blue Origin in 2000. Defendant Bezos owns approximately 53 million shares of Amazon stock. Defendant Bezos purchased the major American newspaper The Washington Post, in 2013, for $250 million. Defendant Bezos was one of the first shareholders in Google. Defendant Bezos invested $250,000 in 1998. Defendant Bezos' $250,000 investment resulted in 3.3 million shares of Google stock, worth about $3.1 billion dollars in 2017. As of November 5, 2020, Defendant Bezos had a net worth of **US$194.0 billion dollars.**

41. The Board of Directors of the Defendant companies, and each of them, jointly and severally, since their creation, and up to the present, has served as a conduit for the fraudulent objectives, by which the interlocking directors of the Defendant companies and their subsidiary members, jointly with other individuals, knowingly, intentionally and unlawfully, have met, planned, devised, organized, and assisted in the adoption and implementation of part, or all, of the fraudulent artifices that form the basis of this complaint as defined herein after. As a direct and proximate result of the acts, omissions and policies described herein, Defendants, and each of them, jointly and

severally, have shared, or will share in **US$2 - $2.5 Trillion dollars** in online Ad revenue this fiscal year.

42.    Whenever it is alleged in the complaint that any Defendant did any act or thing, it is meant that its Directors, Officers, agents, employees, or the Directors, Officers, agents or employees of its subsidiaries or affiliates, performed or participated in such act or thing, and in each instance that such act or thing was authorized or ratified by, and done on behalf of, that Defendant. Plaintiff thereupon alleges, the true names and capacities of Defendants sued as Does/Roes 1 through 10 are unknown to Plaintiff, who therefore sues these Defendants by fictitious names. Doe/Roe Defendants include the employees, agents, servants of the Defendants, and each of them, jointly and severally, who directly approved the acts, omissions and policies described herein, as well as agents, officers and employees of the Defendants who are liable in connection with one or more of the claims sued upon here and are responsible in some manner for the wrongful acts and conduct alleged herein. Plaintiff will amend this Complaint to show Doe/Roe Defendants' true names and capacities when they have been ascertained.

## IV.    JURISDICTION AND VENUE

43.    This is an action for violations of federal antitrust law, including 15 U.S.C. §§ 1, 2. Accordingly, this Court has subject matter jurisdiction over this proceeding and all claims asserted herein pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1337 (antitrust jurisdiction) and 1367(a) (supplemental jurisdiction). This Court has subject matter jurisdiction over this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121 (actions arising under the Lanham Act), and 1338 (b) (any action asserting

claim of unfair competition joined with a substantial and related claims under the trademark law) for the claims arising out of the violations of Section 43(a) of the Lanham Act.

44.     Venue is proper in this district under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 because: (i) each of the Defendants transact business, committed an unlawful or tortious act, and/or are found, in this district; and (ii) a substantial portion of the conduct detailed herein, which affected interstate trade and commerce, has been carried out in this district.

## V.     INTRADISTRICT ASSIGNMENT

45.     Pursuant to the Northern District Civil Local Rule 3-2(d), the intradistrict assignment should be to the Oakland Division or the San Francisco Division. This action arises in Oakland and the County of Alameda because a substantial part of the events giving rise to these claims occurred in the City of Oakland and Alameda County.

## VI.    THE RELEVANT MARKET

46.     Up until 2003, the relevant geographic advertising  market for Plaintiff's claim is worldwide, including the United States and other relevant submarkets thereof. The technology of the  21st Century, has for all practical purposes, caused the relevant market and relevant product market to become inextricably intertwined.

The relevant market for purposes of Plaintiff's claims consist of the following:

(a)     The Internet via website(s) as a relevant market to sell all products;

(1)     Mobile Networking (Android OS) Hardware Routers, Smartphones, Tablets; and

(2)      Mobile (Networking) Android OS Apps.

The relevant product market consists of the following:

(b)      Internet based advertisement on Streamed Videos and Movies;

(c)      Internet based advertisement on Streamed Music and Music videos;

(d)      Mobile Networking (Android OS) [Internet] based advertisement on mobile devices;

(e)      Mobile Networking (Android OS) [Internet] based advertisement on Android OS Apps;

(f)      The sale(s) of digital ad based Internet (cloud-based) music, videos, movies, and images; and

(g)      Digital ad based News Feeds.

## VII.  FACTUAL ALLEGATIONS

### A.      Background

**1.      Plaintiff's Decade of Serving AdSpend/Adsense & Marketing YouTube!**

47.    Between the time period October 15, 2008 and November 13, 2013, Plaintiff created two (2) YouTube channels: the "Harry Williby" channel (http://www.youtube.com/c/HarryWilliby021269, created November 13, 2013) and "The Attorney Depot™" channel (http://www.youtube.com/c/TheAttorneyDepotTM, created October 15, 2008). On October 8, 2008, Plaintiff also created "The Williby Blogs" ( https://willibys-corruptjustice.blogspot.com/) on Defendant Alphabet's Blogger Platform. Beginning in 2011, Defendant Alphabet, dba, Google, dba, Google+, dba, Google AdSense (PPC), dba, Blogger, dba, YouTube, LLC., mandated that YouTube channel

owners create Google+ accounts to access YouTube. As a direct and proximate result of this mandate by Defendant Alphabet, Plaintiff created two (2) Google+ accounts: "The Harry Williby" Google+ account (https://plus.google.com/+HarryWilliby021269) and "The Attorney Depot™" Google+ account. (https://plus.google.com/b/114610022579488515977/+TheAttorneyDepotTM).

48.     Between October 15, 2008 and August 1, 2018, The Attorney Depot™ channel published and hosted Daily, Weekly, Monthly and yearly News, legal news, political, election, trial coverage, documentaries and entertainment videos. Videos hosted on the The Attorney Depot™ YouTube channel were automatically and simultaneously published on The Attorney Depot™ Google+ account. The Plaintiff simultaneously hosted all The Attorney Depot™ videos on Williby Blogs, Twitter and Facebook. Between October 15, 2008 and August 1, 2018, The Attorney Depot™ YouTube channel garnered over twenty-one million (21,000,000+) global, public, video views; and twenty-one thousand (21,000+) return subscribers. Between October 15, 2008 and August 1, 2018, Plaintiff posted and published Daily, Weekly, Monthly and yearly News, legal news, political, election, trial coverage text and images posts on The Attorney Depot™ Google+. These text, image and video posts numbered approximately 10,000 posts. The Google+ account garnered well over two-million viewers and/or visitors as a direct and proximate result of these videos, text and image posts. Between October 15, 2008 and August 1, 2018, The Attorney Depot™ Channel and Google+ account produced, globally marketed and branded "trial court coverage" videos on YouTube. The Attorney Depot™ channel averaged 500,000 -to- 1,000,000 million viewers per month.

Between October 8, 2008 and August 1, 2018, Plaintiff's Blogger pages (Williby Blogs) netted 15k – 40,000 viewers per week, with over one-million global readers/viewers.

49.     The Harry Williby Channel's primary genre was real life interactions, including police interrogations and/or police interactions with civilians. Plaintiff branded raw videos on The Williby Channel as "Streat Beatz™" videos. This genre was so popular on YouTube, The Williby Channel, grossed approximately 1,000,000 (one-million) viewers per year. Between and November 13, 2018, and August 1, 2018, The Harry Williby Channel published and hosted Daily, Weekly, Monthly and yearly News, political, election, documentaries, entertainment and raw videos (or videos shot live on scene by the bystander). Between November 13, 2013 and August 1, 2018, "The Harry Williby Channel," publicly displayed approximately eight-hundred and eight-one (881) videos; garnered eighteen-hundred and forty-nine (1,849) return subscribers; and has (had) approximately four million, one Hundred and eighty-seven thousand (plus) viewers (4,187,000+) on the channel. Between November 13, 2013 and August 1, 2018, videos hosted on "The Harry Williby [YouTube] channel" were automatically and simultaneously published on the Harry Williby Google+ account. Between November 13, 2013 and August 1, 2018, The Harry Williby Google+ account generated approximately 20-25,000,000 million visitors. Between October 15, 2008 and August 1, 2018, The Attorney Depot™ YouTube channel, The Attorney Depot™ Google+ account, Williby Blogs and Plaintiff's Twitter (feed) and Facebook pages were viewed in every country with an Internet connection. As a direct and proximate result of ten (10) years (or a decade) of marketing YouTube and The Attorney Depot™ Channel by Plaintiff, virtually

every major U.S. media network, including the Defendants, and each of them, jointly and severally, has joined YouTube and now host "trial court coverage" videos.

50.    The Google AdSense, Pay-Per-Click, (PPC) is a program run by Defendant Alphabet, dba, Google. Defendant Google purchased the AdSense program on June 18, 2003, from "Applied Semantics." The AdSense program is a Pay-Per-Click advertising program. AdSense (PPC) allows publishers (website/page owners) in the Google Network of content sites to serve automatic text, image, video, or interactive media advertisements, that are targeted to site content and audience. Google Advertisement customers purchase an "ad spend account" with Defendants to have these automatic text, image, video, or interactive media advertisements placed on websites, or pages owned by the plaintiff. These advertisements are administered, sorted, and maintained by Defendant Google. While these advertisements are administered, sorted, and maintained by Defendant Google, Defendants, and each of them, jointly and severally, administer Google AdSense, Pay-Per-Click, (PPC) advertisement programs on their respective owned sites.

51.    In October 2008, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., by way of electronic advertisement, led Plaintiff to believe that if he created a Blogger™ website, or a YouTube channel, Plaintiff could serve Advertisements, under Defendant Google's "AdSense, PPC" program. Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., led Plaintiff to believe that he would receive $0.25 (cents) each time a site visitor clicked on one of the Advertisements, hosted by Plaintiff and served by Defendant.

52.     Plaintiff relied upon this electronic advertisement and In October of 2008, Plaintiff created "The Williby Blogs," (https://willibys-corruptjustice.blogspot.com/); and "The                    Attorney                    Depot™                    Channel" (https://www.YouTube.com/channel/UCPBu0JFPj9R57SyjfCxHvmw), Acting upon this same information and belief, as provided by Defendant Alphabet, dba, Google, LLC., dba,     Youtube,     LLC.,     Plaintiff     created     The     "Williby     Channel" (https://www.YouTube.com/c/HarryWilliby021269) in November of 2013, in an attempt to increase Ad revenue by hosting automatic text, image, video, or interactive media advertisements, served by Defendants. Acting upon this same information and belief, as provided by Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., Plaintiff intentionally hyperlinked directly to, and served videos and blog posts on the following websites (created, managed and operated by Plaintiff):

(I) Harry Williby Google+ profile (https://plus.google.com/+HarryWilliby021269);

(II) Harry Williby @ Twitter (https://twitter.com/wilabee);

(III) The Attorney Depot™ @ Twitter (https://twitter.com/AttorneyDepot);

(IV)     The     Attorney     Depot™     Google+     profile     (https://plus.google.com/ +TheAttorneyDepotTM);

(V) Facebook (Harry Williby) (https://www.facebook.com/harry.williby);

(VI) Facebook (Harry J. Williby) (https://www.facebook.com/Harry.J.Williby); and

(VII) Facebook Pages (Corrupt Justice; The Attorney Depot; and Streat Beatz).

53.     Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google Analytics tracking system demonstrates that between October 8, 2008 and August 1,

2018, Plaintiff's Blogger pages (Williby Blogs) netted 15,000 – 40,000 viewers per week, with over one-million global readers/viewers; Between October 15, 2008 and August 1, 2018, The Attorney Depot™ YouTube channel garnered over twenty-one million (21,000,000+) global, public, video views; twenty-one thousand (21,000+) return subscribers; Between November 13, 2013 and August 1, 2018, "The Harry Williby Channel," publicly displayed approximately eight-hundred and eight-one (881) videos; garnered eighteen-hundred and forty-nine (1,849) return subscribers; generated approximately four million, one Hundred and eighty-seven thousand (plus) viewers (4,187,000+) on the channel;   Between October 8, 2008 and August 1, 2018, The Attorney Depot™ Google+ page generated approximately 350,000 page visits; and between November 13, 2013 and August 1, 2018, The Harry Williby Google+ account generated approximately 20-25,000,000 million visitors/readers/viewers.

54.     Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., effective August 1, 2018, terminated Plaintiff's YouTube channels, The "Williby Channel" and "The Attorney Depot™ Channel." Plaintiff was thus denied access to his Google+, "The Attorney Depot™ page," effective August 1, 2018. Plaintiff was granted access back to his Google+, "The Attorney Depot™ page," effective October 12, 2018, after Defendant Alphabet removed approximately 7,000-to-10,000 posts, placed there by Plaintiff.

55.     Despite over a decade (ten years) of publishing on Defendants' platform, under the Google "Adsense (PPC)" program, Plaintiff did not earn $0.25 per-ad-click. Plaintiff earned less than $2,500.00 (over 10 years) <u>with the vast majority of this revenue being confiscated by Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba,</u>

Google "AdSense (PPC)." In fact, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)," repeatedly, over a ten (10) year time period, accused and adjudicated Plaintiff guilty of copyright infringement, as the basis for confiscating the nominal ad revenue plaintiff earned under the Google "AdSense (PPC)" program.

56.    Defendant Alphabet, dba, YouTube's site is a popular site for music and music videos. Defendant Alphabet, dba, Google, LLC., dba, Google, AdSense (PPC) serves AdSense advertisements on these music videos. Defendant Google replaced Google Play Music with YouTube Remix. YouTube Remix is a music service that's fully integrated with YouTube. Between the time period of October 15, 2008 and August 1, 2018, Defendant Alphabet, dba, Google, dba YouTube, informed plaintiff that music on the YouTube website could be downloaded for free and could be used by Plaintiff on videos uploaded by Plaintiff to The Williby Channel and The Attorney Depot™ Channel, without risk of copyright claims. Plaintiff relied upon these claims by Defendant YouTube and utilized numerous songs from Defendant's database on his videos. As a direct and proximate result of Plaintiff's use of the copyrighted music, a multitude of music copyright owners did in fact file music copyright claims against The Williby Channel and The Attorney Depot™ Channel for the use of this music as provided by Defendant YouTube.  As a direct and proximate result of these music copyright claims against The Williby Channel and The Attorney Depot™ Channel, Defendant Alphabet, dba, Google, dba YouTube, required Plaintiff to publicly acknowledge and/or admit the music copyright claim violations. Defendant Alphabet, dba, YouTube, LLC., then

allowed the music copyright owners to generate AdSense revenue from The Williby Channel and The Attorney Depot™ Channel. <u>Simultaneously, Defendant Alphabet claimed The Attorney Depot™ Channel was now ineligible for monetization, "due to multiple claims of copyright infringement," thus, denying and preventing Plaintiff from earning, or generating AdSense revenue.</u> The Williby Channel was then terminated "due to multiple claims of copyright infringement," and The Attorney Depot™ Channel was terminated for being hyper-linked to a channel with "multiple claims of copyright infringement." As a direct and proximate result of Plaintiff's reliance, upon the false advertisements of Defendant Alphabet, dba, Google, LLC., dba, YouTube, LLC., and Plaintiff's Channels were terminated and Plaintiff prevented from generating ad revenue on any of his sites.

57.    In the same year of 2008, Plaintiff, acting upon information and belief regarding Defendants' advertisement capabilities, Plaintiff initiated and advertised an independent advertisement program on Williby Blogs, and "The Attorney Depot™ Channel." In 2013, Plaintiff extended this independent advertisement campaign to "The Williby Channel." <u>Between October 15, 2008 and August 1, 2018, The Attorney Depot™ generated $0.00 in Google AdSense (PPC) revenue; and Plaintiff's independent advertising programs netted $0.00 in advertisement revenue.</u> Between November 11, 2013 and August 1, 2018 Defendant Alphabet paid "The Williby Channel" and "Williby Blogs" a combined amount of approximately $2,450.00 in AdSense (PPC) revenue. <u>On multiple occasions between October 15, 2008 and August 1, 2018, Defendant Alphabet paid the plaintiff $0.01 for an entire month of Ad hosting, under the AdSense PPC</u>

program. (See Attached Exhibit "A".)

58.     From the period between October 15, 2008 and August 1, 2018, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)," required advertisement customers to purchase an "ad spend account" under Defendants' Google AdSense (PPC) program. Adsense customer advertisements, which included automatic text, image, video, or interactive media advertisements, were then  hosted and served on Plaintiff's websites. Defendant Alphabet charged all advertising customers $0.10 - $0.30 for the placement of "bumper," or "non-skippable" advertisements  on websites owned by Plaintiff. Defendant Alphabet, dba, Google, dba YouTube, also charged advertising fees per video view. Defendant charged fees on ads referred to as "bumper ads," "skippable video ads" and "non-skippable video ads. Defendant Alphabet charged its customers a fee amount unknown to Plaintiff, to place "ad units" on Plaintiff's videos. A typical video ad earned Defendants between $0.10 and $0.30 per click. Thus, an ad campaign (on YouTube) with a $0.10 video view would cost (the ad customer) $1,000 for every 10,000 people that watch the video ad. However, Defendant's Google Adsense customer does not have to pay the $0.10 - $0.30, unless a viewer/reader "clicks" on the "ad unit."   The total Google AdSense revenue generated Defendant Alphabet, between 2008 and 2018 was in the aggregate amount of $680,246,000,000.00 (billion dollars) in on-line "AdSense" advertisement sales.

59.     Defendant Alphabet's Google "AdSense (PPC)" program requires the advertisement customer to pay for the advertisement, only if an advertisement consumer "clicks" on the advertisement. This constitutes free advertisement provided by the

Defendants, jointly and severally. Thus, other advertisers, such as Plaintiff, have virtually no chance of selling advertisements on the Internet. Defendant Alphabet owns all on-line advertising companies and web platforms, except Facebook and Amazon.com. Between June 18, 2003 and August 1, 2018, Defendant Alphabet, dba, Google, LLC., dba, Youtube, LLC., dba, Google "AdSense (PPC)," acquired all of the competitive online advertisers.   The Google "AdSense (PPC)" program now constitutes the only online, digital advertising platform available to consumers. Thus, on June 18, 2003, Defendants embarked upon what is now an online advertisement monopoly, …   by acquisition. The Google "AdSense (PPC)" program violates not only the antitrust laws, the Google "AdSense (PPC)" program violates California State Statute, governing Unfair Competition.

**2.      The inextricably intertwined relevant market and relevant product**

60.      In the instant matter, there exists an inextricably intertwined relevant market and relevant product market. An example of this is the Expedia Group advertising program with Defendant Google. Expedia and its peer Booking Holdings typically spend heavily on Defendant Google's "AdSpend" program. Expedia Group Chairman Barry Diller said the travel company spends **$5 billion dollars annually** on online, digital advertising. Both Expedia and Booking Holdings have complained of Defendant Google's tactics. One tactic includes Defendant Google building its own travel search products that compete with the travel search products of Expedia and Booking Holdings. The only option available to Expedia and Booking Holdings in this case would be to shift advertising to Defendant Facebook, or Defendant Amazon. Both

the other defendants use Defendant Google's "AdSpend" and "Adsense" (PPC) program. All three defendants function on the Android OS and exercise complete platform control. There are no other relevant market substitutes available to Advertisers, Content Creators, Website owners, customers and end-users for products within the web based advertising market, the Internet streamed video and movie market, or the Internet streamed music, or music video market. There are barriers to entry into the web based advertising market, including the Internet streamed video; movie market; Internet streamed music; and music video market. These barriers include Defendants' unlawful anti-competitive activities to exclude competition. The defendants' anti-competitive conduct in the relevant market has excluded competitors and resulted in consumers paying higher prices than they would have paid in competitive markets. Consumers paying higher prices for the relevant product and the exclusion of competitors are indicia of Defendants' market power and unlawful anti-competitive conduct, which in itself constitutes an unlawful monopoly.

**3.      The Defendants Complete Market Power Over online, digital advertising**

61.      The Defendants, and each of them, jointly and severally, are a conglomerate of professional online, digital advertising franchises. The Defendants, and each of them, jointly and severally, places strict limits on the number of webpages, web page advertisements any person, or entity can place online. Through the Defendants' Android operating system and browser monopoly, they control where those pages and ads are located, and require that all content creators/website designers host and/or use Google

AdSense (PPC) to sell online advertisements. The defendants control the complete share of revenues and financial benefits of Google AdSense (PPC) participation. The entire online advertisement apparatus is made up of only 3 companies, ... Google, Facebook and Amazon, Inc., ... the across the entire globe. Any efforts by the Defendants to claim they are a single entity are strongly rebuffed by Courts, most notably the Supreme Court's 9-0 ruling against this view in American Needle, Inc. v. National Football League, 560 U.S. 183 (2010).

62.    Since 2003, Defendant Google has used "Applied Semantics" in a highly technical manner to improve its market dominating, anti-competitive conduct. "Applied Semantics" became "Google AdSense," "pay-per-click," (and "Google AdSpend," "pay-per-click") meaning that advertisers pay "only when" a person clicks on an ad. With AdSense, Google broke out of search and onto the wider Web with contextual targeting technology that soon overwhelmed other players, such as Sprinks and IndustryBrains. Adsense uses targeted ads on general content pages, based upon the user, by matching them to text on the pages. Defendant Google went on to become much more than an "upstart search engine." Defendant Google became the largest of "only" three advertising companies in the world (including Facebook and Amazon). By 2005, AdSense was about 15 percent of Google's revenue. Defendant Alphabet's search engine [Google] AdSense ad sales, are the second largest source of revenue for Alphabet. In 2016, Defendant Alphabet earned nearly all of its revenue from Google advertising based on users' search requests. "Google AdWords" is an advertising platform that allows businesses to show their product to relevant potential customers based on their search terms. AdWords

helped deliver 96% of the company's revenue in the first quarter of 2011. There exists no real alternative to AdSense for publication of ads on web properties" given AdSense's ability to target ads, leverage Google's search technology, set up accounts quickly and easily, and access the largest global advertiser pool on the web. As of 2018, Defendant Alphabet had an overall market capitalization that exceeded $500 billion dollars. Two years later in 2020, Defendant Google's parent company (Defendant Alphabet) has entered the $1 trillion market cap club for the first time.

63.     Defendant Amazon, Inc., began in 1994 as an online bookstore. The company has since expanded to a wide variety of other e-commerce products and services, including online digital advertising, video and audio streaming, cloud computing, and artificial intelligence. Defendant Bezos initially named his new company Cadabra. Defendant Bezos later changed the name to Amazon after the Amazon River in South America, in part because the name begins with the letter A, which is at the beginning of the alphabet. In November 2007, Bezos launched the Amazon Kindle, a device that allows a "flow state" in reading and advertisements that are similar to the experience of video games. In October of 2007, Defendant Amazon was recognized as the largest online shopping retailer in the world. On February 1, 2018, Defendant Amazon reported its highest ever profit with quarterly earnings of $2 billion. In 2020, Defendant Amazon's online digital ad revenues in the United States are projected to amount to **$12.75 billion U.S. dollars** with growth declining to a still impressive 23.5 percent year-over-year. In 2019, Amazon's annual online digital ad revenue grew by 39.4 percent. Defendant Amazon is currently the world's largest online sales company and the

largest Internet company by revenue.

64.     Facebook currently makes 98.5% of its money from digital advertising, mostly ads on Facebook and Instagram. Facebook (FB) makes most of its money by serving ads on the social media and messaging platforms it owns — Facebook, Messenger, Instagram, and WhatsApp. Advertisers pay Facebook to make their ads visible to people. Advertisers can choose to "target" the ads by only showing them to people who fit certain characteristics. These include age, gender, country, interests, etc. Advertisers choose the targeting options, and Facebook then shows the ads to the right people based on automated computer algorithms. Facebook has 2.89 billion monthly active users across its "family" of products. Of these, 2.26 billion people use at least one of their products each day. This means that Facebook reaches about 3/4 of the world's internet population. Due to its massive user base, Defendant Facebook makes a lot of money from serving online, digital ads. Most of the ads are "pay-per-click," meaning that advertisers pay Facebook each time a person clicks on an ad. Even though each click may not cost that much, it quickly adds up to billions of clicks and billions of dollars. According to Defendant Facebook, "there are now 8 million businesses globally that use their advertising platform." There are 90 million business pages on Facebook. 140 million businesses use Facebook every month to communicate with prospective customers and employees, or to engage with their communities (this stat refers, however, to Facebook products, not just Facebook itself). According to Defendant's "eMarketer Facebook" marketing statistics, more than 85% of US marketers have used Facebook as a marketing platform since 2016 – a figure that has increased to 87% in 2020.

65.     Defendant Alphabet, dba, Google and Defendant Facebook remain the dominant digital advertising companies. They controlled a combined 58 percent of the $111 billion market, in 2018. This is down from 59 percent in 2017 (Google 38.6% and Facebook 19.9%). Defendant Amazon, Inc., generated $4.61 billion in U.S. digital ad sales in 2018. This represents 4.2 percent of the total digital ad market. Advertising is quickly becoming one of Defendant Amazon's most lucrative businesses. This is in addition to its e-commerce engine and cloud computing arm. Advertising doesn't have its own category in Defendant Amazon's earnings reports and is listed under a category called "Other." The category "Other." brought in $2.7 billion in revenue in the first quarter (of 2019), up 34 percent over a year ago. As of October 26, 2020, the total of desktop and mobile banner advertising was $38.1 billion in FY 2019, a 13.8% increase on 2018's $33.5 billion. Desktop Banner Advertising dropped from a 22.5% share to 20.3% in 2019. The Banner share on mobile decreased from 35.8% to 35.1%; **however, revenue increased by 21.5% to $30.4 billion**. However, without any reasonable hope of a "competitive company," that can compete with the Defendants, Facebook, Alphabet, or Amazon, Inc., the market for owning or hosting such a "competitive company," is significantly constrained. The Defendants' complete control over online, digital advertising in the United States, combined with its ability to artificially limit the supply of websites and digital ads and who can host ads, enables it to hold Plaintiff and consumers hostage by imposing anti competitive conditions on being an Advertiser, Content Creator, Website owner, or consumer. As the Ninth Circuit recognized in American Needle, Inc. v. National Football League, 560 U.S. 183 (2010), the Defendants

herein, acts as a cartel, limiting the supply of websites and digital ads, as well as, who can host ads to create anti competitive pressures on website owners, content creators and ad consumers.

66.    Recently, the Defendants have increasingly used Google AdSense (PPC)'s complete market power and the Digital Millennium Copyright Act (hereafter "DMCA") to exert this anticompetitive pressure on Plaintiff. Through Google's AdSense for Content program ("AdSense"), Google contracts with website operators who publish ads on their websites in exchange for a percentage of the money advertisers pay to place the ads. Google terminated each of Plaintiff's Google's AdSense accounts without cause and withheld the entirety of the earnings Plaintiff had accrued, but had not yet been paid upon termination. The Payment Terms of Google's AdSense allows Google, in its sole discretion, to withhold earnings from Plaintiff, or a publisher for "invalid activity." Plaintiff's websites and YouTube channels were viewed by tens of millions of viewers and readers, while simultaneously serving Google Adsense ads. After a decade of serving Google's AdSense ads on multiple webpages for defendants, the defendants, acting in concert, and jointly, aiding, abetting, and conspiring with each other, accused Plaintiff of "invalid activity," to wit:  "Due to multiple claims of copyright infringement[,]" [from multiple sources,] resulting in the termination of Plaintiff's Google Adsense accounts and confiscation of all revenue earned. In addition to termination of the Adsense account and revenue confiscation, Defendant Alphabet, dba, Google, dba, YouTube, terminated Plaintiff's YouTube channels and blocked Plaintiff's access to the counter-notification process under 17 U.S.C. § 512, Subsection (g) (1). In retrospect, Defendant   Google

asserted misuse of the DMCA in a filing concerning New Zealand's copyright act. Defendant Google argued that "takedown notices" targeting a competing business made up over half (57%) of the notices Google has received; and that more than one-third (37%), "were not valid copyright claims." However, it is the Defendant Alphabet who uses the DMCA to target and intimidate competitors of Alphabet, Defendant Facebook and Defendant Amazon.

67.   The Defendants Alphabet, and on behalf of the other Defendants, jointly and severally, and through the Google Adsense, (PPC) program, have entered into online digital advertising contracts with the following companies:

- Viacom, dba Paramount Pictures Corporation;

- Apple Corps Ltd.;

- Sony Corporation;

- Hearst Corporation;

- Walt Disney Company;

- Tele München Fernseh GmbH + Co. Produktionsgesellschaft (VOD);

- Icon Film Distribution Pty Ltd (Australia VOD);

-  Mel Gibson and long-time producing partner Bruce Davey (co-owners of Icon Film Distribution Pty Ltd (Australia VOD); and

- Fintage House, dba, Lasso Group.

68.   These are brand name, global movie, video, music and advertising companies with major internet presences. Due to the fact the Defendants, jointly and severally, have multi-billion dollar "AdSpend" accounts with these individuals

companies, each company has been allowed by Defendant Alphabet and Defendant Facebook (and on behalf of Defendant Amazon) to file frivolous copyright claims against the Plaintiff under the DMCA, causing Plaintiff to lose significant online, digital advertising revenue.

**B.      The Monopolistic horizontal price fixing scheme**

69.      Under the traditional forms of advertising, an <u>advertising customer pays to place an advertisement,</u> regardless of the size of the ad, the placement, or length of time the ad runs. Under this tradition, the advertisers pay to place the ad, regardless of what the consumer does. On March 25, 2004, United States Patent Application No. 20040059708, was filed by Jeffrey A. Dean for Adsense. This patent application has been assigned to Google, Inc. The patent is titled: "<u>Methods and apparatus for serving relevant advertisements."</u> The Adsense methodology states: "*The relevance of advertisements to a user's interests is improved. In one implementation, the content of a web page is analyzed to determine a list of one or more topics associated with that web page.* <u>*An advertisement is considered to be relevant to that web page if it is associated with keywords belonging to the list of one or more topics.*</u> *One or more of these relevant advertisements may be provided for rendering in conjunction with the web page or related web pages.*" This <u>"Methods and apparatus for serving relevant advertisements[,]"</u> is actually an "apparatus" and foundation of Defendants' market power and unlawful anti-competitive conduct. After the 2003 launch of Google Adsense, "Pay-Per-Click," companies like Plaintiff's found themselves at a disadvantage when Defendant Google and the others began offering productivity software for free.

70.    Defendant Alphabet markets Google Adsense, "Pay-Per-Click," under two different stratagems: An "AdSpend," or an "AdSense" account. The difference between a Google "AdSense" account and an "AdSpend" account is, the "AdSpend" account is used when an advertiser buys advertising space from Google. The "AdSpend," average cost-per-click (CPC) on Google Ads is $1 to $2 for the Google Search Network and less than $1 for the Google Display Network. Generally, small-to-midsize companies will spend $9000 to $10,000 per month on Google Ads. Larger companies, such as those listed in paragraph 43, will spend $1,000,000 to $10,000,000 per month on Google Ads. Thus, as long as a website visitor does not click on the digital ad, the ad is virtually viewable by the consumer for free, thereby eliminating competitors, such as Plaintiff. These "AdSpend," costs do not include additional costs paid to Defendants for things such as software and technical support. On the other hand, the Google "AdSense" account is the revenue sharing account where Defendant Alphabet pays the website owner, or content creator for serving advertisements on the web page. However, the Google "AdSense" account and the "AdSpend" account are the methodologies in which the Defendants used unlawful anti-competitive conduct to obtain complete market power, thus obtaining a monopoly by acquisition. The "AdSpend" (pay-per-click) account provides free, online, digital advertising to advertisers, thus eliminating all competition. The Google "AdSense" (pay-per-click) account is used to limit the number of advertisements, a website owner, or content creator can post and the amount of revenue a website owner, or content creator can generate. In furtherance of this unlawful anti-competitive conduct, Defendant Alphabet and Defendant Facebook (and on behalf of

Defendant Amazon) simply assert "invalid activity," or a "violation of the DMCA" and confiscate (for their own benefit) revenue generated through the Google "AdSense" (pay-per-click) account of Plaintiff (and other website owners, or content creator.) As of today, over 10 million websites are using Google "AdSense" accounts. Facebook users are clicking on an average of 12 adverts per month (14 for women, 10 for men). Hence, the Google "AdSense" (pay-per-click) is merely a "horizontal price fixing scheme." See *Free Range Content, Inc. v. Google Inc.,* No. 5:14-cv-02329 (BLF).

**4.    The Defendants have acquired An Advertising "Monopoly by Acquisition(s)."**

**A. The Defendants have divisely purchased all of competitive online digital advertising companies under a Horizontal Market Agreement**

71.    Defendant Zuckerberg stated in 2010: "We [Facebook] have not once bought a company for the company. We buy companies to get excellent people... In order to have a really entrepreneurial culture one of the key things is to make sure we're recruiting the best people. One of the ways to do this is to focus on acquiring great companies with great founders." Acquisitions have been key to growing these businesses and Defendant Facebook's revenue in general. Defendant Facebook's strategy has been to buy potential rivals before they can get too big. In the process, the Defendant sometimes has paid exceptionally high prices for some deals. Defendant Facebook tried to buy Twitter in 2008 for $500 Million. The big impact for Defendant Facebook would have been a massive data merger of the databases of both companies (Twitter/Facebook). In an email, Defendant Zuckerberg implicitly threatened to create a clone of Twitter if Twitter

didn't sell. Defendant Facebook later deployed this tactic against the likes of Snapchat and Twitch. In late 2013, "SnapChat" CEO, Evan Spiegel rebuffed a $3 billion takeover offer from Defendant Zuckerberg. The vast majority of Defendant Facebook's acquisitions have been shut-down.

72.    Defendant Facebook has acquired 82 other companies, including WhatsApp. The WhatsApp acquisition closed at $19 billion. Defendant Facebook would later merge the databases of both the WhatsApp acquisition and Facebook. The Instagram acquisition, announced on April 9, 2012, appears to have been the first exception to this pattern. Defendant Facebook makes money from ads on Instagram. In the time since Spiegel spurned Defendant Zuckerberg, Defendant Facebook has turned Instagram into a key growth driver and a "Snapchat" killer. Instagram mimics Snapchat features. Instagram has been combined with Facebook's own service. Instagram now offers advertisers access to more than 2 billion users, as well as detailed data about their online "likes" and habits. According to the investment bank Morgan Stanley, "Some Instagram advertisers are now getting for free a type of sponsorship that they have to pay for on Snapchat." Defendant's Facebook Marketplace platform has hundreds of millions of users. Many brands and influencers also rely heavily on Instagram to market their products. Defendant Facebook launched Instagram Checkout in the US. This makes it possible for some businesses to sell products directly through the platform. The Israeli company Onavo was Founded in 2010. Defendant Facebook acquired Onavo in October 2013 for an undisclosed amount some analysts estimated to be between $100 million and $200 million. At the time of the acquisition, Onavo was an independent company. Onavo

performs web analytics on other mobile apps to determine customer usage. <u>Onavo's technology allowed Defendant Facebook to make crucial early determinations about other companies and apps to acquire.</u> Facebook was the second most-used mobile app in the world over Q3 2019 and the second most downloaded. In addition, <u>Most of Defendant Facebook's revenue now comes from ads on their mobile apps</u>. The Messaging app service Beluga was acquired by Facebook in 2011. Defendant Facebook acquired Beluga and the technology that eventually became the social media company's highly successful Messenger platform. In the process, <u>Defendant Facebook again expanded its offerings and eliminated a potential rival. Now, Almost all of their revenue comes from serving targeted advertising on their internet platforms</u> (Facebook platform, Instagram, Instagram Stories Facebook Messenger, Facebook Marketplace, and WhatsApp.). Defendant Facebook claimed no less than 40% of US digital ad revenue in 2018. Defendant Facebook's unlawful anti-competitive conduct has helped it become one of the world's leading marketing and advertising platforms.

73.   Google purchased the "Google AdSense" program from "Applied Semantics" in 2003. Applied Semantics was an obscure Santa Monica, Calif., company that made "software applications for the online, digital advertising, domain name and enterprise information management markets." The acquisition of "Applied Semantics" was for $102 million in cash and stock. <u>The Android operating system was acquired by Google in 2005.</u> In 2006, Defendant Google paid $102 million for another Web advertisement business, "dMarc Broadcasting." In the same year (2006) <u>Defendant Google announced that it would pay $900 million over three and a half years for the right</u>

to sell ads on "MySpace.com." Defendant Google then purchased Defendant YouTube for $1.65 billion dollars in 2006.  In 2007, Defendant Google made its largest acquisition to date by purchasing online, digital advertising firm "DoubleClick" for $3.1 billion. The "DoubleClick" acquisition transferred to Defendant Google, valuable relationships that "DoubleClick" had with Web publishers and advertising agencies. In 2009, Defendant Google purchased the mobile advertising network "AdMob," for $750 million. In 2011, Defendant Google acquired the survey site Zagat for $125 million. Defendant Google acquired the Israel-based startup Waze in June 2013. Defendant Google submitted a 10-Q filing with the Securities Exchange Commission (SEC) that revealed Google spent $1.3 billion on acquisitions during the first half of 2013. The 10-Q filing showed that $966 million of the total $1.3B was paid to Waze. As of March 31, 2019 Defendant Google acquired Night corn, a Video sharing service. As of December 2020, Alphabet has acquired over 238 companies, The largest acquisition being the purchase of Motorola Mobility, a mobile (phone) device manufacturing company, for $12.5 billion. As of January 14, 2020, Defendant Google acquired  AppSheet, a Mobile app development and Pointy, a Local retail inventory feed software app.

74.   Omid Kordestani was senior advisor to the Office of the CEO and Founders at Google. On October 14, 2015 Kordestani left Google. Twitter announced Omid Kordestani as its Executive Chairman. In 2017, Defendant Google and Twitter agreed to an acquisition deal. Google acquired Twitter's suite of developer products, including its developer suite Fabric. Fabric includes the crash reporting service Crashlytics. Twitter acquired Crashlytics back in 2013. "Fabric" is a collection of products that Twitter rolled

out in 2016 to try and encourage mobile app developers to integrate more closely with Twitter's core app. Defendant Google acquired "Fabric" and integrated it with its own developer team, "Firebase." "Firebase," is a backend-as-a-service startup. <u>The company was acquired by Google in 2014</u>. The developer platform has since expanded. "Firebase" quadrupled its number of users to 450,000 by mid-2016 and added analytics capabilities and mobile development tools. By 2019, Defendant ended support for "Fabric." "Firebase," Defendant Google's mobile and web application development platform, swallowed "Fabric" and all its features. Incidentally, <u>both Fabric and Firebase were once separate companies.</u>

75.      In 1997, <u>Defendant Bezos used $54 million dollars raised through Amazon's initial public offering (IPO) to finance aggressive acquisition of smaller competitors. In 1998, Defendant Bezos diversified into the online sale of music and video</u>. In 2002, Bezos led Amazon to launch Amazon Web Services, which compiled data from weather channels and website traffic. <u>In 2013, Bezos secured a $600 million contract with the Central Intelligence Agency (CIA) on behalf of Amazon Web Services</u>. Defendant Amazon, Inc., returned to making multiple acquisitions per year in 2005. <u>Defendant Bezos focused on acquiring digital retailers and media websites</u>. Amazon acquired the video streaming site Twitch. Starting in 2011, Defendant Amazon began shifting its focus to buying technology startups to develop and improve Amazon Echo and grow its Amazon Web Services division.   In 2019, <u>Amazon acquired parts of a global ad tech company to bolster its rapidly growing advertising business</u>. Defendant Amazon acquired Sizmek's Ad Server and its <u>Dynamic Creative Optimization tool, which helps personalize</u>

ads using data. Defendant Amazon, Inc said in a press release <u>the two companies have a</u> <u>lot of customers in common, "so we know how valued these proven solutions are to their</u> <u>customer base."</u> On August 5, 2013, Defendant Bezos announced his purchase of The Washington Post for $250 million in cash. The sale closed on October 1, 2013. In March 2014, Defendant Bezos made his first significant change at The Washington Post. Defendant Bezos removed the online paywall (making news content and advertising free) for subscribers of a number of U.S. local newspapers in Texas, Hawaii, and Minnesota. In January 2016, Defendant Bezos reinvented the newspaper as a media and technology company by reconstructing its digital media, mobile platforms, and analytics software. After a surge in online readership in 2016, the paper was profitable for the first time since Defendant Bezos made the purchase in 2013. <u>Defendant Amazon's advertising includes</u> <u>sponsored products in search and display ads to reach audiences based on their likely</u> <u>purchase intentions, while the e-commerce retailer's trove of first-party data about</u> <u>millions of customers helps with ad targeting.</u>

76.     Advertising drives a majority of revenue for Defendant Google  (dba Twitter) and Defendant Facebook, <u>which charge advertisers to have their marketing</u> <u>content appear on search results and news feeds. Defendant Amazon employs a similar</u> <u>strategy.</u> Defendant Amazon uses its online marketplace and other platforms, giving vendors, authors, and other advertisers ways to reach potential customers. One of Defendant Amazon's main competitive advantages as it gears up to share in a larger portion of advertising revenue with dominant digital advertising players Google and Facebook, <u>is the data Defendant Amazon has on customer purchasing habits.</u> Defendant

Bezos developed the mantra "Get Big Fast", establishing the company's need to scale its operations to produce market dominance. eMarketer forecasts <u>e-commerce channel advertising to represent 12.2% of all U.S. digital ad spending by the end of this year</u> (2020). Defendant Amazon is the dominant player by far. As a consequence of the Horizontal Market Agreement, competition between Defendants has been entirely eliminated in the three markets. to wit: Digital Advertising, Android OS and Online sales of goods. Accordingly, Defendants Amazon, Facebook and Google are now the only three digital advertisers in the United States and the only three beneficiaries of Defendant Google's AdSpend/Adsense.

**B.      The Google "AdSense" (pay-per-click) "horizontal price fixing scheme" And the Acquired Advertising Monopoly has and Continues to Net the Defendants Trillions of Dollars.**

77.      In early 2020, Defendant Alphabet, dba, Defendant Google, disclosed that on an annual basis, Defendant YouTube generated $15 billion last year and contributed roughly 10 percent to all Google revenue. <u>These figures make Defendant YouTube's ad business nearly one fifth the size of Defendant Facebook's, and more than six times larger than all of Defendant Amazon-owned Twitch. Defendant Alphabet, dba Google, LLC., dba, YouTube, LLC.,  will earn $39.58 billion dollars in U.S. advertising revenue this year (2020), compared with $41.80 billion dollars in 2019. Despite the decline, Google's ad revenues will still exceed the $36.48 billion earned in 2018.</u> Defendant Alphabet, dba Google, LLC., dba, YouTube, LLC., and its former or current subsidiaries, generated Google AdSense revenue, in the following amounts, for the following quarters:

- For the quarter ending June 30, 2018, Defendant Alphabet generated AdSense revenue in the amount of $32.657B, a 25.56% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending June 30, 2018 was $123.898B, a 24.8% increase year-over-year;

- Defendant Alphabet's annual AdSense revenue for 2017 was $110.855B, a 22.8% increase from 2016;

- Defendant Alphabet's annual AdSense revenue for 2016 was $90.272B, a 20.38% increase from 2015;

- Defendant Alphabet's annual AdSense revenue for 2015 was $74.989B, a 13.62% increase from 2014;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2014 was $66.001B, a 15.25% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2013 was $55.519B, a 52.75% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2012 was $46.039B, a -2.84% decrease year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2011 was $37.905B, a 25.40% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2010 was $29.321B, a 26.46% increase year-over-year;

- Defendant Alphabet's AdSense revenue for the twelve months ending

December 31, 2009 was $23.651B, a 17.07% increase year-over-year; and

- Defendant Alphabet's AdSense revenue for the twelve months ending December 31, 2008 was $21.796B, a 18.11% increase year-over-year.

78.     The total AdSense revenue for Defendant Alphabet, between 2008 and 2018 was in the aggregate amount of $680,246,000,000.00 (billion dollars) in on-line digital "AdSense" advertisement revenue. As of 2020, and a direct and proximate result of Defendant's unlawful, anti-competitive conduct, Defendant Google massively beat Wall Street expectations on profit margins. Defendant Google's hardware businesses are lumped together with subscription services like YouTube Premium and YouTube Music Premium in Defendant Google's "Other" category, all of which added up to a total of $17 billion of revenue in 2019. This suggests that Defendant Google's hardware business (motorola mobility, Pixel phones and laptops; Nest doorbells, cameras, speakers, thermostats, Chromecast dongle and the Google Wifi router) rakes in at least $2 billion, but theoretically a bit more. The defendants expect revenue to rebound by more than 20% in 2021 and to see 11.8% growth in 2022.

79.     Defendant Facebook's annual/quarterly revenue history and growth rate from 2009 to 2020 has been abnormally astronomical. Revenue is the top line item on an income statement from which all costs and expenses are subtracted to arrive at net income. Approximately 42.8% of Defendant Facebook's global revenue in 2019 came from the United States. Facebook revenue for Q3 2019 came to a stately $17.65 billion. This compares to $16.89 billion in Q2 2019 (a 5% increase), and $13,727 in Q3 2018 (a 29% increase). Indeed, it is the highest single quarterly Facebook revenue figure ever

generated, beating the previous record of $16.91 billion in Q4 2018. Defendant Facebook's revenue from Canada region was **$1.98 billion during 2019**. Defendant Facebook's revenue from the International markets such as Europe, India, Canada, etc. clocked $15.06 million in 2016. Facebook fiscal year starts from January 1st. Interestingly, the fiscal 2016 was the first time when the company reported over $10 billion in advertising revenue from the United States. This represented 45.5% of the total annual revenue in 2016. In 2019,  Europe contributed $4.12 billion (23%); Asia $3.27 billion (19%); and the rest of the world $1.77 billion (10%). Of all major global digital ad sellers, only Defendant Google's business is worth more than Defendant Facebook's. eMarketer stats forecasting total net ad revenue over 2019 (published in March 2019) estimated Facebook's total for the year would come to $67.37 billion, with Google at $103.73 billion. Facebook total net ad revenue is over twice the figure of third-place Alibaba ($29.2 billion).

- Facebook revenue for the quarter ending September 30, 2020 was $21.470B, a 21.63% increase year-over-year.

- Facebook revenue for the twelve months ending September 30, 2020 was $78.976B, a 18.71% increase year-over-year.

- Facebook annual revenue for 2019 was $70.697B, a 26.61% increase from 2018 (In 2019, the social media company reported its highest-ever annual revenue of $30.23 billion from the United States, with 25.4% YoY growth.).

- Facebook annual revenue for 2018 was $55.838B, a 37.35% increase from 2017 (Of that $55.83 billion, a tidy $21.11 billion was profit ).

- Facebook annual revenue for 2017 was $40.653B, a 47.09% increase from 2016.

- Facebook annual revenue for 2016 was $27.6B, a 54.2% increase from 2015.

- Facebook annual revenue for 2015 $17.93B, an increase of 44% year-over-year.

- Facebook annual revenue for 2014 $12.47B, an increase of 58% year-over-year.

- Facebook annual revenue for 2013 $7.87B, an increase of 55% year-over-year.

- Facebook annual revenue for 2012 $1.585B, an increase of 40% year-over-year.

- Facebook annual revenue for 2011 $$3.71B, an increase of 88% year-over-year.

80.     Defendant Facebook, Inc. held its initial public offering (IPO) on Friday, May 18, 2012. <u>The IPO was the biggest in technology and one of the biggest in Internet history, with a peak market capitalization of over $104 billion.</u> Prior to 2011, Defendant Facebook was tight-lipped about its revenue numbers, which is typical of private companies. Market experts estimate Defendant Facebook made between $700M - $1.1 billion in total revenue between the years 2008 through 2010. Even in the earlier days, Defendant Facebook's growth was explosive. 2013's figure of $7.87 billion represents a tenfold increase over 2009's $777 million. Five years on from that, in 2018, the figure had increased sevenfold once more. Defendant Facebook's market valuation is now approximately $607 billion dollars. The total AdSense revenue for Defendant Facebook, between 2008 and 2018 was in the (approximate) aggregate amount of $365,250,000,000.00 (billion dollars) in on-line digital "AdSense" advertisement revenue. As of January 8, 2019, Facebook (FB) had a market capitalization of $409.6 billion dollars.

81.     As of October 2020, <u>Amazon's advertising revenue rose 51%</u> to $5.4 billion

dollars in Q3 from a year earlier. The growth in online, <u>digital ad sales was greater than Amazon's total revenue gain of 37% to a record $96.1 billion dollars.</u> Subscription revenue, which includes the fees that people pay for Amazon Prime memberships, audiobooks, digital video, digital music and e-books, rose 33% to $6.57 billion dollars. Amazon's ad revenue growth was stronger in Q3 than in the prior quarter, when it reported a 41% yearly gain. The company anticipates total revenue will grow anywhere from 28% to 38% in Q4 (2020) <u>as consumers continue to show a greater preference for online shopping. Defendant Amazon's ad business accounted for $10.32 billion in revenue last year (2019) and is expected to grow to $12.75 billion dollars in 2020.</u> Defendant Amazon's ad revenue growth this year (2020) helps to solidify its place <u>as the third-biggest digital ad platform in the U.S. behind Defendant Alphabet's Google and Defendant Facebook.</u>

82.     As of October 2019, <u>Ad spend through Amazon's DSP was up 30% in Q3, compared with a 27% increase in Q2, as advertising brands increasingly leveraged the ability to target ads on Defendant Amazon's web properties as well as on those web properties Defendant Amazon doesn't own.</u> In Q3, 32% of the Ad spend through Amazon's DSP went to properties not owned by the e-commerce giant. <u>The cost of digital ads on Amazon in Q3 accelerated as cost-per-thousand impressions (CPM) rose 15%, up from the 5% increase seen in Q2. Ad spend on Defendant Amazon's Sponsored Products increased 30% year-over-year in the U.S. and 50% for international campaigns.</u> Revenue generated by Defendant Amazon's Sponsored Products jumped 30% while clicks climbed 18% and the cost-per-click rose 10%. The portion of ad spend allocated to brand

awareness was 42% in Q3, a significant lift over the 26% measured in Q1. The majority of Defendant Amazon's DSP ad spend still goes to purchase-focused campaigns. In furtherance of this unlawful anti-competitive conduct, Last year in 2019, Defendant Google held 31.6% of total digital advertising spending with Defendant Facebook and Defendant Amazon holding 22.7% and 7.8% respectively. This year, market analysts expect Defendant Google to claim 29.4% of digital ad spending with Defendant Facebook and Defendant Amazon clawing 23.4% and 9.5%, respectively.

**5.    The Defendants have jointly conspired to engage in unlawful anti-competitive conduct from 1998 -to - Present.**

**A.    The "Obama Phone" (UMX U686CL).**

83.    The Barack Obama administration, well into the internet and wireless age, agreed that broadband and cellular services are essential services. Citizens of various federal programs now qualify for a <u>free-service</u> cell phone. The UMX U686CL is a <u>cell phone subsidized by the US government for low-income users.</u> The UMX U686CL is provided by (the Sprint owned) Virgin Mobile's Assurance Wireless program at $35 per phone. Assurance Wireless is an offshoot of the Lifeline Assistance program (LAP). The LAP is a Federal Communications Commission <u>free</u> phone plan.    <u>The LAP is often referred to as the Obama Phone</u> because it was expanded in 2008, when President Barack Obama took office. <u>The UMX U686CL runs on the Android OS.</u> The Android operating system <u>was acquired by Google in 2005. Between 2005 and 2020, Defendant Alphabet has paid a total of **$80 billion dollars** out to Android developers.</u>    The UMX device comes with hidden apps installed. The first app, <u>"Android/Trojan.Dropper.Agent.UMX,"</u>

is heavily obfuscated <u>malware that installs adware and other unwanted apps without the knowledge or permission of the user.</u> The "<u>Android/Trojan.Dropper.Agent.UMX,</u>" contains striking similarities to two other trojan droppers. For one, <u>it uses identical text strings and almost identical code.</u> Secondly, the app contains an encoded string. When this string is decoded, it contains a hidden library named: "<u>com.android.google.bridge.Libgmp</u>" that aggressively displays ads. Once the library is loaded into memory, it installs software Malwarebytes calls "<u>Android/Trojan.HiddenAds.</u>" <u>The malware that installs these programs is hidden in the phone's settings app.</u> This makes it virtually impossible to uninstall. The phone can't operate properly without the Settings app. Market experts agree on one thing: "If you Uninstall the Settings app, you've just made yourself a pricey paper weight." This conduct represents the brain of Defendants Alphabet, Amazon and Facebook's unlawful, anti-competitive conduct.

> **B.    The Anti-Competitive Android Operating System**

84.    The Android operating system was first developed by Android, Inc., a software company located in Silicon Valley. After <u>Defendant Google acquired Android in 2005,</u> the Android operating system was developed by Google for use in all of its touchscreen devices, tablets, and cell phones. <u>The vast majority of phones on Earth run Android.</u> As a result, and in furtherance of the conspiracy to engage in unlawful, anti-competitive conduct, Android and Google Mobile Services (GMS) are now synonymous with each other, even though they are actually quite different, … <u>Defendant Alphabet provides both Android and Google Mobile Services for free.</u> The Android Open

Source Project (AOSP) is an open-source software stack for any device, from smartphones to tablets to wearables, created by Google. Defendant Google believes giving Android away for free increases the size of the world's Web-connected population. The company believes that increasing the Web-connected population will inevitably lead to more Google searches — which Google can monetize with search ads. GMS, on the other hand, are different. GMS are a range of Google-branded services that Google wants you to use for daily interaction. These services include Gmail, Google Maps, Google+, Google Play, Chrome and YouTube, and while these run on Android OS to a large extent, many of them are also available on iOS. Google doesn't charge a fee for GMS, it places stringent approval processes on all device OEMs that want to offer GMS, and has moved some of the key Android core functionality and APIs into GMS in order to better control and monetize them. Android increasingly dominates as it becomes fragmented, leading to the balance of power to swing from GMS to AOSP. An Android device without Google Play is an Android device without access to more than a million apps.

85.    Defendant Amazon's Kindle Fire and the Fire smartphone are completely Android-based, but devoid of any Google Mobile Services. Defendant Amazon has had to create its own app store, API stack and developer program. OEMs that are not as big as Amazon, but want to build their own branded ecosystems on Android, will reach out to providers to deliver white labeled app stores, and API and app management platforms in order to create a third party developer portal. Facebook for Android refers to the official mobile app developed by Defendant Facebook for Android cell phones and tablets. The app is free to download and install from the Google Play store. Defendant Facebook's

official suite of apps include Facebook Messenger, Facebook Groups, Facebook at Work, and Facebook Mentions. <u>Defendant Facebook's Instagram added 10 million users in just ten days, after making its service available on Android.</u>

86.     Defendant Google created the underlying value of the Android OS. Defendant Amazon and Defendant Facebook, as well as <u>Alibaba,</u> Baidu, Microsoft, Tencent and Xiaomi are all using the Android OS. Defendant Google announced Android Pay almost directly after Apple announced Apple Pay. Google's most notable payments acquisition was Softcard, a contactless NFC based mobile payments solution. <u>AT&T, Verizon, and T-Mobile wireless service carriers have agreed to pre-install Google payment apps on their android phones.</u> Defendant Google's Android is used daily by 1.17 billion people worldwide, while 1.35 billion people use Defendant Facebook's Apps daily. On Thanksgiving Day 2020, online, web-based sales shattered previously recorded profits. Consumers spent $5.1 billion online on Thanksgiving Day 2020 alone. Spending is up 21.5% from last year (2019). <u>Nearly 50% of the web-based purchases were made on an android smartphone.</u> These numbers and profits are a direct and proximate result of Defendants Alphabet, Amazon and Facebook's unlawful, anti-competitive conduct.

**C.     Twitter and the Unlawful Conspiracy to Engage in Unlawful, Anti-Competitive Conduct**

87.     <u>Defendant Bezos was one of the first shareholders in Google in 1998. Defendant Bezos was also an early investor in the current Twitter. Defendant Bezos invested about $15 million in Twitter (TWTR) just over a decade ago in 2008,</u> through his investment firm Bezos Expeditions. <u>Twitter founder Jack Dorsey was an early angel</u>

investor in Instagram. Dorsey previously supported Instagram financially and allegedly expressed interest in buying Instagram prior to Defendant Facebook's acquisition of the company. In fact, Twitter had a deal in place to buy Instagram for $525 million back in March 2012. However, Defendant Zuckerberg prevailed with a $1 Billion dollar offer. Dorsey (@jack) unfollowed Defendant Zuckerberg (@finkd) on Twitter in December of 2019, after Zukerberg purchased Instagram. Dorsey now, the CEO of Twitter and Square, receives a monster financial return he made on his angel investment in Instagram, which he gets back many times over in cash and pre-IPO Facebook stock.

88.     Defendant Facebook's Mark Zuckerberg tried to acquire Twitter not once, but twice through official channels and via co-founder Dorsey. In 2008, Facebook executive Chris Cox had been meeting in coffee shops with Dorsey, who had just been exiled from Twitter. Cox wanted to hire Dorsey. A Facebook owned Twitter would have reaped bigger profits, making ads on Facebook a little better, but really supercharging the ads on Twitter. The combined information would have allowed for precision targeting of sponsored tweets. The 330 million or so users on Twitter now are chicken feed for Facebook. Dorsey's exile from Twitter ended in March 2011, when then-CEO Dick Costolo brought him back.

89.     Defendant Google having acquired Android OS in 2005, now owns all Twitter Development tools as of 2019. The Twitter advertising page reads: "This page and certain other Twitter sites place and read third party cookies on your browser that are used for non-essential purposes including targeting of ads. Through these cookies, Google, LinkedIn, NewsCred and Logicad collect personal data about you for their own

purposes."

90.     The <u>video live-streaming app</u> Periscope was acquired by Twitter in 2015. Periscope is being shut down. <u>On December 15, 2020, Defendant Google (the owner of Twitter) announced: "We have made the difficult decision to discontinue Periscope as a separate mobile app by March 2021." This isn't the first video service Twitter has acquired and subsequently discontinued.</u> The company also bought Vine, a short video app in 2012 before shutting it down in 2017. Thus, Defendant Bezos, (on behalf of Amazon) Twitter CEO Dorsey, Defendants Facebook/Zuckerberg and Defendant Alphabet, dba Google are working together as apparent beneficiaries of this unlawful, anti-competitive conduct.

**D.     The Obama Administration, the UMX U686CL (Android OS) and the "Cloud-based" Conspiracy to Engage in Unlawful, Anti-Competitive Conduct**

91.     Former Pres. Obama (while campaigning for President in the 2008 election) told Google employees during a 2007 visit to Google's headquarters in Mountain View, California: "What we shared is a belief in changing the world from the bottom up, not from the top down." Between October 15, 2008 August 1, 2018, Defendant Alphabet, dba, Google, dba, YouTube, invited, allowed and supported (now) Former President Barack Obama to campaign, raise funds and secure votes and voters, via Obama's YouTube channel(s) Obama Dotcom (pre-election channel); The Obama White House (President's Channel); and The Obama Foundation (Presidency & PostPresidential Channel). Defendant Google employees emerged as the No. 2 donors to the Democratic National Committee in the 2008 election. <u>Defendant Google employees and the</u>

company's political action committee gave $1.6 million to Democrats in the 2008 presidential election. Google hosted multiple fundraising events for former President Barack Obama. Google's fund-raising executives for Obama's Presidential campaign included Susan Wojcicki and Marissa Mayer. Defendant Schmidt and other Google executives forked over $25,000 apiece to help pay for the inaugural celebration. Then-Google Chief executive, Page, also wrote a check to help pay for Obama's inauguration. Defendant Schmidt also served as an informal economic adviser during the Obama campaign.

92.   In 2008, multiple "ex-Google employees" joined the Obama administration in various roles. Defendant Schmidt became a member of Obama's Council of Science and Technology Advisers. Google's former head of global public policy, Andrew McLaughlin, was named deputy chief technology officer in Obama's administration. President Obama's appointment of McLaughlin to a position in his administration, resulted in McLaughlin being in a position that shaped policy, ... that affected Google's rivals. Defendant Google's, Vice President Marissa Mayer, acting as co-chairwoman of a report commissioned by the Knight Foundation and the Aspen Institute, called for greater broadband deployments and "open-access policies." Defendant Google's, Vice President Mayer was the sole author of the report. Obama's FCC chairman Julius Genachowski and Obama's Chief Technology Officer, Aneesh Chopra, praised the report. Genachowski and Chopra both said the paper would guide Obama's Internet policy. Obama and his tech regulators, including Genachowski, had long supported one of Google's top policy priorities: codifying "Net neutrality," or rules that prohibit network providers like AT&T,

Verizon, and the cable operators from prioritizing traffic and content that run on their networks. While working for Defendant Google, Obama's deputy chief technology officer McLaughlin, championed Google's policy goals.

93.     Immediately upon taking office in 2008, Obama made the government-subsidized cell phone, the UMX U686CL, which runs the Android OS, available to millions of low-income families. UMX U686CL disbursements ballooned to $2.2 billion during President Barack Obama's first term. Over the years since Obama's election as President, preinstalled (advertising) malware has been found on a raft of low-cost Android phones from a variety of providers and manufacturers.

94.     Washington, D.C. Mayor Adrian Fenty appointed Vivek Kundra to the cabinet post of Chief Technology Officer (CTO) for the District of Columbia, on March 27, 2007. Kundra used Defendant Google's cloud-based web applications while employed in the D.C. (City) government. The District of Columbia paid $479,560.00 for the "Enterprise Google Apps" license. Since its deployment in July 2008 Google Apps has been available to over 38,000 D.C. city employees. In 2008, Kundra served as technology adviser on President Barack Obama's transition team. Kundra was officially named to the post of Federal Chief Information Officer by President Obama on March 5, 2009. The Federal Chief Information Officer is responsible for directing the policy and strategic planning of federal information technology investments as well as for oversight of federal technology spending. Kundra oversaw the government's tech spending. On September 15, 2009, during an event at NASA's Ames Research Center in Mountain View, California, Kundra announced a new site that lets federal agencies buy Google

"cloud computing" Apps that run on the Internet, instead of installing software on their computers. Kundra also announced the launching of the federal government strategy and the (Google) cloud computing portal Apps.gov. Defendant Brin attended this event and said Defendant Google was launching a "government cloud" data center specifically designed for government agencies.

95.     In late 2010, hoping to spur use of Gmail, the D.C. (City) government ran a pilot program. The City selected about 300 users and had them use the Defendant Google's product (Gmail) for three months. Google participated closely in  the project. The first major cloud project during Kundra's tenure was GSA's migration of email/Lotus Notes to Defendant Google's Gmail and Salesforce.com's platform. GSA awarded a contract for email to Defendant Google in December 2010. In July 2011, the General Services Administration (GSA) became the first federal agency to migrate its email services for 17,000 employees and contractors to the cloud-based Google Apps for Government.

96.     GSA awarded a five-year contract to Salesforce.com in August 2011.  In January 2012, Kundra joined Salesforce.com as Executive Vice President of Emerging Markets (*Most notably, Salesforce.com made an official announcement on Tuesday, December 1, 2020, of their plans to buy SLACK TECHNOLOGIES INC., for $27.7 billion.*). In February, 2017 Kundra joined Outcome Health as EVP of Provider Solutions. He was then promoted to Chief Operating Officer in July. Vivek left Outcome in Nov 2017 after major investors filed a lawsuit alleging improper practices against its founders for misleading advertisers and investors.

97.    In 2007, Facebook Co-Founder Chris Hughes met with Jim Brayton (then) Senator Obama's Internet director, via phone. A couple of weeks before Obama's official announcement that he was running for President, Brayton and Hughes met in person over coffee at Union Station in D.C. Brayton decided to hire Hughes on the spot. <u>Hughes created the on-line campaign apparatus that got Barack Obama elected as President of the United States.</u> Hughes helped develop the most robust set of Web-based social-networking tools ever used in a political campaign. Obama's campaign manager David Plouffe said (on April 1, 2009): "Technology has always been used as a net to capture people in a campaign or cause, but not to organize." Chris saw what was possible before anyone else." Hughes' key tool was My.BarackObama.com, or MyBO for short. The website "Obama for America" (https://www.ofa.us/) was originally created as My.BarackObama.com by Hughes. The networking Web site, <u>interfaced with Facebook</u> and allowed Obama supporters to create groups, plan events, raise funds, download tools and connect with one another. <u>By the time the campaign was over, volunteers had created more than 2 million profiles on Facebook, planned 200,000 offline events, formed 35,000 Facebook groups, posted 400,000 blogs, and raised $30 million on 70,000 personal Facebook fund-raising pages.</u>

98.    Sheryl Sandberg is Chief Operating Officer for Defendant Facebook, Inc. Sandberg has been COO at Facebook since March of 2008. Prior to working for Defendant Facebook, Inc., <u>Sandberg was vice president of Global Online Sales and Operations at Google.</u> Prior to this, Sandberg was Chief of Staff for the United States Treasury Department under President Clinton. <u>Sandberg also sat on President Obama's</u>