<u>Council on Jobs and Competitiveness.</u> In 2016, Google executives and Sandberg, on behalf of Facebook, met with President Obama to discuss strategies <u>including counter speech initiatives and efforts to identify potential terrorists online.</u> Facebook provided ad credits worth up to $1,000 to those who post counter-extremist messages, <u>and together with the State Department,</u> launched competitions in 45 college classes around the world. Those who participated in the competition were provided a budget of $2,000 and $200 in ad credits.

99.    On April 20, 2011, <u>President Barack Obama made a campaign-style visit to the nexus of social communications, Facebook, Inc.'s headquarters,</u> in Menlo Park, California, <u>at the invitation of Defendants Zuckerberg and COO Sandberg.</u> President Barack Obama, Defendant Zuckerberg, and Facebook COO Sheryl Sandberg answered questions from users as part of a Facebook Live town hall meeting. By visiting Facebook headquarters in Silicon Valley, Obama sought to connect to <u>tens of millions of people who have adopted social media as a prime method of communications.</u>

100 .   Defendant Facebook's hosting President Obama in April 2011 at Facebook's headquarters was choreographed and timed to Defendant Facebook's much-expected initial public offering (IPO). President Obama got to talk directly to potential voters. Facebook got incredible validation. In July 2011, <u>Facebook was the most popular third-party app on Google's Android platform. Facebook came in third place on Google's first-party apps.</u> In August 2011, Facebook introduced Facebook Messenger, a new mobile app. It became available August 11th in the US and Canada for Android on <u>Google's Android Market</u> and for the iPhone on Apple's App Store. <u>This app is the result</u>

of Facebook's acquisition of Beluga. In December of 2011, Facebook became the most popular Android app among adult smartphone owners in the US.

101.    Facebook filed its $5 billion IPO in February of 2012, stating: "*We had 432 million MAUs who used Facebook mobile products in December 2011. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook.*"

102.    In 2012, Defendants Facebook, Inc., Defendant Zuckerberg and COO Sandberg integrated political campaign data with Defendant Facebook's data. This integrated data change was critical to President Barack Obama's 2012 re-election.

103.    Carol Davidsen is the former director of integration and media analytics at Obama for America. Davidsen is a data expert. She worked on the Obama campaign from November 2011 to November 2012. On Twitter, Davidsen explained how the 2012 Obama campaign harnessed Defendant Facebook's Application Programming Interface (API) to access the company's "social graph." Defendant Facebook's "social graph" maps the Facebook users connections. This enabled the Obama campaign to access information on Defendant Facebook users' friends when they used the Facebook log-in button to access the campaign's website.

104.    On March 18, 2018, Davidsen tweeted: "I worked on all of the data integration projects at O[bama] F[or] A[merica]. In a subsequent tweet on March 18, 2018, Davidsen added: "They came to office in the days following election recruiting &

were very candid that they allowed us to do things they wouldn't have allowed someone else to do because they were on our side."

105.   Defendant Facebook has denied that there was any favoritism toward the Obama campaign in the 2012 election. However Barack Obama's re-election team built a vast digital data operation that for the first time combined a unified database on hundreds of millions of American voters  with the power of Facebook to target individual voters to a degree never achieved before. "The [Obama 2012] campaign's exhaustive use of Facebook was so intense, it triggered the site's internal safeguards."

106.   Defendant Facebook had over 432 million monthly active mobile users as of December 2011. This represents 51.1 percent (up from 50.3 percent) of Facebook's total user base of 845 million monthly active users. Thirteen point four (13.4) percent accessed Facebook strictly through mobile, while the rest accessed Facebook from desktop and mobile. Thus, by allowing Obama to harness Facebook API's, Defendant Facebook, in furtherance of the unlawful conspiracy to engage in anti-competitive conduct, generated billions of dollars in online ad revenue. Facebook's mobile user must access Facebook using the Android OS, which is preloaded with malware that installs adware and other unwanted apps without the knowledge or permission of the user.

107.   Federal law "bans corporations from making 'direct or indirect' contributions to federal candidates." This ban doesn't just include cash, but anything of value. "In other words, corporations cannot provide federal candidates with free services of any kind." Defendant Facebook gave the Obama campaign free access to this type of data when it normally does not do so for other entities, or usually charges for such access to this data.

Defendant Facebook appears to have violated the federal ban on in-kind contributions by a corporation. The Obama campaign appears to have violated the law by accepting such a corporate contribution. U.S. Election officials all agree on one point: "Carol Davidsen's admissions should provide a sufficient basis for opening a federal investigation into what appears to be a clear and serious violation of the law."

108.    In 2008, it was Google and Facebook that went to Barack Obama and met him at San Francisco airport and told him all about the power of this personal data. In 2010, Defendant Facebook divulged unique user IDs to advertisers, which were used to track consumers. In the same year, the "Silicon Valley Insider" published old instant messages in which Zuckerberg makes incendiary remarks such as calling the earliest Facebook members "dumb fucks" for trusting him with their information.

109.    In 2016, Defendant Zuckerberg said live video was the future of Facebook, and he had a big get to help it grow: President Barack Obama. The plan was for Obama and Zuckerberg to talk together in some manner on Facebook Live, potentially allowing many thousands of people around the globe to tune in. In May 2016, viewers tried to watch a BuzzFeed interview with Obama on "Facebook Live," but the stream failed. C-SPAN resorted to showing streams from Facebook Live and Periscope (Twitter's live video product) in order to broadcast the sit-in by members of the House of Representatives.

110.    Defendant Facebook then paid news outlets like The New York Times, CNN, and BuzzFeed more than $50 million to encourage them to produce more Facebook live video content.

111.   The Facebook data mining  in 2012 was a win-win situation for Obama, and allowed by Defendant Facebook, in furtherance of Defendant Facebook's conspiracy to engage in unlawful, anti-competitive conduct. Facebook's D.C. office established ties to the Obama administrations. <u>Defendant Facebook hired Marne Levine, former chief of staff of Obama's National Economics Council, as its new vice president of global public policy.</u> Thus, the Defendants, Facebook and Zuckerberg, and each of them, jointly and severally, have engaged the highest Office(s) of the United States, in furtherance of their conspiracy to engage in unlawful, anti-competitive conduct.

112.   On October 8, 2009, Defendant Amazon.com CEO Jeff Bezos sat down for a lunch meeting with President Obama. <u>Defendant Amazon was ramping up its efforts to sell cloud-computing services to federal government agencies. "Cloud Computing" represented a potentially huge new market for the company.</u>

113.   With its Kindle tablet, Defendant Amazon had a product it wanted to sell. Defendant Amazon launched Kindle Singles Corner in June of 2013. A Kindle single is a type of e-book which is published through Amazon's Kindle Store. Kindle Singles Corner was made available <u>to both Kindle device and Android OS App users,</u> and priced between $0.99 and $4.99.

114.   In July of 2013, the Defendant Amazon conducted a sit-down interview with President Obama. <u>The interview was  featured on Defendant's new Kindle Singles Corner. In July of 2013 President Obama praised Defendant Amazon for the firm's job creation, which notably put independent bookstores out of business.</u>

115.   In 2019, Defendant Amazon's federal corporate income tax bill was zero.

The Obama administration vocally supported several of the tax credits and deductions used by Amazon. The research and development (R&D) credit allows companies to quickly recover the cost of expenditures for research and experimentation. President Obama in several of his budget proposals, not only supported the R&D credit, Obama advocated for making it permanent and expanding it. Defendant Amazon also utilized full business expensing, which allows companies to deduct the cost of new equipment purchased. In 2019, Defendant Amazon also deducted losses from previous years and for stock compensation granted to employees.

116.   Jay Carney is a top advisor to Defendant Jeff Bezos and architect of Defendant Amazon's HQ2. Carney is Senior Vice-President of Worldwide Corporate Affairs at Amazon. Carney is essentially Amazon's public policy and communications chief. Carney was President Barack Obama's press secretary from 2011 to 2014. For the first two years of Obama's presidency, Carney was director of communications for Vice President Joe Biden.

117.   Defendant Bezos hired Carney as Defendant Amazon was entering a tougher regulatory environment. Carney had all the important connections. Carney is a unique presence in the company's highest ranks. He's one of only two remote members of Bezos' exclusive S-team, the 18 most senior executives who work closely with the CEO, along with Amit Agarwal, the head of Amazon India.

118.   Every policy team member's performance is tracked through a rigorous internal program called "Watering the flowers." The flowers represent elected officials, and the goal is to create a well-tended "garden" of pro-Amazon policymakers, from state

governors and senators down to local officials and economic development teams, according to current and former employees. Based on sales management software from Salesforce.com, the program measures employees on things like how many meetings and events they attend with power players.

119.   In 2017, Carney hired Michael Punke, a former U.S. ambassador to the World Trade Organization, to lead Defendant Amazon's public policy two years ago. Carney hired Susan Pointer from Google in 2018 to lead international public policy. Thus, it is clear that the ingratiation with Obama and hiring of ex-Obama and Google executives was done in furtherance of Defendant Bezos and Defendant Amazon's conspiracy to engage in unlawful, anti-competitive conduct.

120.   In 2007, Obama became the seventh presidential candidate to visit Google's main campus in Mountain View. After an introduction by Google's Senior VP David Drummond, Obama unveiled his new policy agenda on technology and innovation. He reaffirmed his support for network neutrality, saying: "The Internet is perhaps the most open network in history. We have to keep it that way."

121.   Obama was interviewed by Defendant and then-Google CEO Eric Schmidt. Defendant Schmidt says, during the Q&A, that he thinks of the job of running for president much like trying to get a job at Google — it's difficult. Obama laid out a detailed package of technology policies designed to [...], put high-speed broadband within reach of all Americans, [...] and, drive America's competitiveness. As part of his plan, (then) Sen. Obama said he would use the Internet to give citizens better visibility into, and greater participation in, the workings of their government, stating: "*I'll put*

*government data online in universally accessible formats. I'll let citizens track federal grants, contracts, earmarks, and lobbyist contacts. I'll let you participate in government forums, ask questions in real time, offer suggestions that will be reviewed before decisions are made, and let you comment on legislation before it is signed. And to ensure that every government agency is meeting 21st century standards, <u>I'll appoint the nation's first Chief Technology Officer.</u>"*

122.    [Obama] talked about his "<u>Google for Government</u>" bill (which is now law) to create a searchable database for every dollar of federal spending. [Obama] said, "If you give people good information, they will make good decisions." In the first presidential debate, (then) <u>Senator Barack Obama mentioned he worked with Senator Tom Coburn</u> "<u>to set up what we call a Google for Government, which says that we are going to list every dollar of federal spending to make sure that the taxpayer can take a look and see.</u>" The actual name of this law is the Federal Funding Accountability and Transparency Act of 2006 (S. 2590) (FFATA), and it mandates the Office of Management Budget <u>to ensure the existence and operation of a single searchable website,</u> accessible by the public at no cost to access information on federal grants, contracts, earmarks and loans. This "single searchable website" is the same "cloud-based" website Defendant Brin stated Defendant Google would build when he attended the NASA event with Vivek Kundra.

123.    On July 1, 2010, Obama called "Sergey Brin's Google" one of the "great ventures" that was made "possible because of immigrants." On May 10, 2011, Obama referred to [Defendant] Google as a "great American company" that "created countless jobs" and was founded by an immigrant. However, Defendant Google may well be one of

the "great ventures" and a "great American company" that "created countless jobs."

However, Defendant Brin and Google's meeting(s) and working for Barack Obama's administration(s) were done in furtherance of Defendant's conspiracy to engage in unlawful, anti-competitive conduct.

**E.    The Obama and the Biden   Administrations Are "Unnamed Conspirators" in the Defendants' Conspiracy to Engage in Unlawful, Anti-Competitive Conduct**

124.    In 2019-2020, Defendant Amazon contributed $8.9 million dollars through individual and PAC donors to federal candidates. <u>Defendant Amazon's top recipient was Joe Biden, who received $1.7 million dollars.</u> Defendant Amazon's PAC contributed just over $1 million to the total spending, including a $5,000 donation from Defendant Bezos. As with the Obama campaign(s) and administration(s) in 2008 and 2012, certain <u>confirmed names on (President-elect) Joe Biden's transition team</u> are intrinsically associated with the Defendants' unlawful, anti-competitive conduct. Biden has publicly confirmed the following persons to his transition team:

- Tom Sullivan, <u>international tax director at Amazon</u> -  State Department;

- Mark Schwartz, <u>enterprise strategist at Amazon Web Services</u>; Executive Office of Management and Budget team (White House);

- Michael Hornsby, <u>director of customer success at Salesforce.com</u>; General Services Administration (GSA) team;

- Phillip Carter, <u>senior corporate counsel at Tableau Software (owned by Salesforce.com)</u>; Department of Veterans Affairs; and

- Will Fields, senior associate at Sidewalk Labs (owned by Defendant Alphabet): Treasury review panel.

125.   President Biden is also reportedly considering former Alphabet, dba, Google CEO [and Defendant] Eric Schmidt for a leading role in a tech industry task force in the Biden administration. Alphabet contributed $21 million dollars to the 2020 Presidential election. The top recipients were Joe Biden and Democrat super PACs. Defendant Alphabet's employees and PACs contributed a whopping $3.66 million dollars to the Joe Biden campaign since 2019. Defendant Pichai contributed a total of $10,000 through six donations to Google's PAC. Defendant Larry Page made a $5,000 one-time donation in late 2019.

126.   Employees and PACs affiliated with Defendant Facebook donated a total of $6 million dollars during the 2020 election cycle. The Joe Biden campaign alone received $1.3 million dollars from the Defendant Facebook PAC. Defendant Zuckerberg made direct political donations to the Facebook PAC. However, Defendant Zuckerberg and his wife, Priscilla Chan, gave $400 million dollars to local governments in order to foot the bill for 2020 election-related costs. Thus,  the Defendants, jointly and severally, and in furtherance of the conspiracy to engage in unlawful, anti competitive conduct, have donated approximately $432 million dollars to the Democrat Party and the Biden campaign in the 2020 election cycle.

127.   On December 9, 2020, Defendant YouTube stated (on their official blog): "Yesterday was the safe harbor deadline for the U.S. Presidential election and enough states have certified their election results to determine a President-elect. Given that, we

will start removing any piece of content uploaded today (or anytime after) that misleads people by alleging that widespread fraud or errors changed the outcome of the 2020 U.S. Presidential election, in line with our approach towards historical U.S. Presidential elections. For example, we will remove videos claiming that a Presidential candidate won the election due to widespread software glitches or counting errors. We will begin enforcing this policy today, and will ramp up in the weeks to come."

128.    The Representatives of the Defendants dominate the entire Biden transition team. The Defendants regarded the eight years from 2009 to 2016 as a golden age in which Obama-Biden chose to revert to traditional laissez-faire policies. The Obama-Biden policies allowed the Defendants to grow into a monopoly and do as they liked without the heavy hand of federal regulation. It was Twitter (owned by Defendant Google) that led the way when it came to shutting down news coverage of the revelations about Hunter Biden's influence-peddling reported by the New York Post. It was Twitter (owned by Defendant Google) who also shut down the subsequent revelations pointing toward the former Vice President Biden's direct involvement in his son's schemes to profit from his father's role as Obama administration point man on policy toward Ukraine and China. The agenda of all of the Defendants' technology executives now helping Biden fill the thousands of administration posts, will be to ensure that reforms aimed at punishing Defendants for their monopoly exploitation of the public information highway, ... will never materialize. Given the Defendants place at the table in Biden's incoming administration, there's no reason to think this monopoly will diminish, rather than grow, over the next four years.

**6.     The Defendants have jointly conspired with mainstream media and movie outlets to engage in unlawful anti-competitive conduct on the YouTube Website.**

**A.     YouTube's Background**

129.    YouTube was founded by Chad Hurley, Steve Chen, and Jawed Karim. The domain name "YouTube.com" was activated on February 14, 2005 with video upload options being integrated on April 23, 2005. The three creators realized they couldn't find any videos of it on the internet, after noticing that this type of platform did not exist they made the changes to become the first major video sharing platform.

130.    The idea of the new company was for non-computer experts to be able to use a simple interface that allowed the user to publish, upload and view streaming videos through standard web browsers and modern internet speeds. Thus, YouTube was created as an easy to use video streaming platform that wouldn't stress out the new internet users of the early 2000s.

131.    YouTube allows users to upload videos, view them, rate them with likes and dislikes, share them, add videos to playlists, report, make comments on videos, and subscribe to other users. The site has a wide variety of user-generated and corporate media videos. Utilizing the YouTube slogan "Broadcast Yourself," YouTube was marketed as an alternative to (mainstream) Major Media and Movie outlets.

132.    Before being purchased by Google, YouTube declared that its business model was advertisement-based, making 15 million dollars per month. This kickstarted YouTube's rise to becoming a global media dominator, creating a $15-billion dollar

annual advertising, video and music sales business that has surpassed most television stations and other media markets.

133. Defendant YouTube now operates as one of Defendant Google's subsidiaries. <u>Advertising is YouTube's central mechanism for gaining revenue.</u> Advertisements were launched on the site beginning in March 2006. In April 2006, YouTube started using Google AdSense. Defendant Google bought the site in November 2006 for US$1.65 billion. At the time YouTube was Defendant Google's second-largest acquisition.

134. On March 31, 2010, YouTube launched a new design with the aim of simplifying the interface and increasing the time users spend on the site. In May 2010, it was reported that YouTube was serving more than two billion videos a day, which was <u>"nearly double the prime-time audience of all three major US television networks combined."</u> According to May 2010 data published by market researchers, YouTube is the dominant provider of online video in the United States, with a market share of roughly 43 percent and more than 14 billion videos viewed during May.

135. In May 2011, YouTube reported on the company blog that the site was receiving more than three billion views per day. In January 2012, YouTube stated that the figure had increased to four billion videos streamed per day.

136. On October 25, 2012, The YouTube slogan (Broadcast Yourself) was taken down due to the live stream of the U.S. presidential debate. Defendant YouTube relaunched its design and layout on December 4, 2012 <u>to be very similar to the mobile and tablet app version of the site.</u> In 2012, the site had eight hundred million unique users

a month. In March 2013, the number of unique users visiting YouTube every month reached 1 billion.

137. As of October 2020, <u>YouTube is the second-most popular website in the world, behind Google,</u> according to Alexa Internet. <u>Alexa Internet, Inc. is an American web traffic analysis company based in San Francisco and a wholly owned subsidiary of Defendant Amazon.</u> Starting from 2010 and continuing to the present, Alexa ranked Defendant YouTube as the third most visited website on the Internet after Defendants Google and Facebook.

**B.     The YouTube AdSpend/Adsense Conspiracy To Mislead Plaintiff As A Content Creator/Website Designer.**

138. In October 2008, Plaintiff joined Defendant's Blogger™ and YouTube websites, <u>based strictly upon Defendants marketing the sites as alternatives to (mainstream) Major Media and Movie outlets.</u> However, nothing was further from the truth. The agreement between Google to purchase YouTube in 2006 came after <u>YouTube presented three agreements with major media companies</u> in an attempt to avoid copyright-infringement lawsuits.

139. On June 4, 2007, Hearst-Argyle Television Inc. (now Hearst, Inc.) <u>one of the nation's largest operators of local TV stations, began distributing news, weather and entertainment video to Google Inc.'s YouTube in a revenue-sharing agreement.</u> The deal between Defendant YouTube and Hearst/Walt Disney marked the first time a TV station got paid when people viewed their content on the YouTube site. Hearst is partnered with the Walt Disney Company. Effective June 4, 2007, five of Hearst-Argyle's biggest

stations began posting local video content to channels on YouTube. The stations included WCVB in Boston and KCRA in Sacramento, Calif.

140.   Most notably, In Williby v. Hearst, Case No. [5:15-cv-02538-EJD] (a case regarding a video posted on YouTube) Counsel for the Defendants, Hearst., Inc., successfully argued that the California federal court lacked jurisdiction to hear a case in which they were named defendants. However, nothing was, or remains further from the truth. Hearst, Inc., in partnership with the Walt Disney Company had YouTube AdSpend/Adsense PPC Revenue sharing accounts as early as June 2007. Defendants and their counsel withheld this information during the proceedings. Williby v. Hearst proceeded before the U.S. District Court for the Northern District of California in 2015-2016. At all times mentioned herein (2008 -thru- present) Defendant YouTube was owned, operated and conducted all business within the State of California.

141.   Hearst received an undisclosed portion of the revenue generated from advertising sold against the video clips it made available to YouTube. Jordan Hoffner, (then) head of premium-content partnerships for YouTube, said both companies would likely [continue to] sell ad inventory, and the ads would take various forms. Newspaper sales of local online video ads totaled $81 million in 2006, compared with $32 million for TV stations. Thus,.

142.   Defendant Google continued to market YouTube as an alternative to mainstream, major media. Again, nothing is further from the truth. Hearst, Inc., owns newspapers, magazines, television channels, and television stations, including the San Francisco Chronicle. Hearst, Inc., owns 50% of the A&E Networks cable network group

and 20% of the sports cable network group ESPN, both in partnership with The Walt Disney Company. Hearst is the largest affiliate of Walt Disney Company's "ABC" Media Company. In 2006, Hearst reached about 18% of U.S. households. In the same year, Hearsts' 26 television stations streamed 38 million videos on their Web sites in 2006, up 29% from a year earlier.

143.   In addition to Hearst, Inc. and the Walt Disney Company, and as early as 2007, Defendants had in fact established AdSpend/Adsense accounts on YouTube for "Icon Film Distribution Pty Ltd (Australia VOD)," "Tele München Fernseh GmbH + Co. Produktionsgesellschaft VOD (TMG)," "Viacom, dba, Paramount Pictures," "Zefr SonyPictures," "Live Storms Media," "Lasso Entertainment," "Apple Corps Ltd.," "cocheusadoooo," "VideoVigilanteOKC," "Content Media Corporation International Limited," "Remove Your Media LLC," Brian M. Heiss, Jean-Xavier de Lestrade, Robert Schmidt and John Nicholas Broomfield, a documentary producer.

144.   Defendant Alphabet, dba, Google, dba, YouTube, knowing since June 2007, that YouTube would not be operated as an alternative to mainstream media, allowed each of the competing parties listed above, to file copyright claims against plaintiff, … resulting in the termination of both Plaintiff's YouTube channels. Plaintiff not only served Adsense advertisements for a decade (2008-2018) for Defendant Alphabet, dba, Google, dba, YouTube, Plaintiff now knows he was serving ads and generating revenue for parties who Plaintiff believed were his competitors, … for a period of ten years. [Emphasis added.]

145.   Plaintiff was intentionally misled by the Defendant Alphabet, dba, Google,

dba, YouTube for a period of ten years. The Defendants, jointly and severally, and through the Adsense program, or horizontal price fixing scheme, misled Plaintiff into designing websites and creating content, ... all for the benefit of the Defendants (Facebook, Google, Amazon) and mainstream media and movie studios.

146.   The specific acts as set forth below clearly demonstrate <u>Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios.</u> Specifically:

- YouTube entered into a marketing and advertising partnership with NBC (owned by Hearst, Inc.) in June 2007;

- On July 23, 2007 and November 28, 2007, CNN and YouTube produced televised presidential debates in which Democratic and Republican US presidential hopefuls fielded questions submitted through YouTube;

- On June 19, 2007, (then) Google CEO Eric Schmidt went to Paris to launch the new localization system. The interface of the YouTube website is available with localized versions in 89 countries, one territory (Hong Kong) and a worldwide version;

- In November 2008, <u>YouTube reached an agreement with MGM, Lions Gate Entertainment, and CBS,</u> allowing the companies to post full-length films and television episodes on the site, <u>accompanied by advertisements in a section for US viewers called "Shows". The move was intended to eliminate competition with websites such as Hulu, which features material from NBC, Fox, and Disney;</u>

- In early 2009, <u>YouTube registered the domain www.youtube-nocookie.com for videos embedded on United States federal government websites;</u>

- In January 2010, YouTube introduced an online film rentals service which is currently available only to users in the US, Canada and the UK;

- In March 2010 YouTube began free streaming of certain content, including 60 cricket matches of the Indian Premier League;

- According to YouTube, the 60 cricket matches were <u>the first worldwide free online</u> broadcast of a major sporting event;

- During November 2011, the Google+ social networking site was integrated directly with YouTube and the Chrome web browser, allowing YouTube videos to be viewed from within the Google+ interface;

- In October 2012, for the first-time ever, YouTube offered a live stream of the U.S. presidential debate and partnered with ABC News to do so;

- On April 4, 2012, YouTube and Paramount Pictures reached a deal to make nearly 500 films available to rent online;

- In May 2013, YouTube launched a pilot program to begin offering some content providers the ability to charge $0.99 per month or more for certain channels, <u>but the vast majority of its videos would remain free to view;</u>

- Defendant Google launched YouTube TV in April 2016, initially in just five markets. It's now available in the top 100 U.S. markets, with YouTube TV expanding to more than a dozen additional markets. This gives Defendant Google coverage of the top 100 U.S. markets, reaching over 85% of U.S.

households;

- In early March of 2018, YouTube TV became available on Roku players and Apple TV devices. This is in addition to Xbox One consoles, Android TVs, Samsung and LG 2016 and 2017 smart TVs, Chromecast, and Chromecast built-in TVs;

- On March 13, 2018, Under a deal with Turner Networks, YouTube TV added the programmer's suite of eight networks, including CNN, TBS and TNT. With the addition of Turner, YouTube TV now offers more than 50 networks in the base package, including local ABC, CBS, Fox, and NBC stations, plus cable networks like ESPN, AMC, and FX, and local sports networks from NBC Sports, Fox Sports, and NESN in select markets;

- In 2019, YouTube TV offers a 7-day free trial to subscribers

- In 2019, Verizon Wireless offers new & existing <u>Android phone</u> customers a 30-day free trial of YouTube TV; and

- On December 1, 2020, YouTube TV begins offering new subscribers a 21-day free trial.

147.   The new markets where YouTube TV is now available are: Honolulu; Lexington, Ky.; Dayton, Ohio; El Paso, Texas; Burlington, Vt.; Plattsburgh, N.Y.; Richmond, Va.; Petersburg, Va.; Mobile, Ala.; Syracuse, N.Y.; Champaign, Ill.; Springfield, Ill.; Columbia, S.C.; Charleston, S.C.; Harlingen, Texas; Wichita, Kan.; Wilkes-Barre, Pa.; and Scranton, Pa.

148.   In 2012, Defendant YouTube's employee, Malik Ducard, (then) director of

content partnerships at YouTube is quoted as saying: "Paramount Pictures is one of the biggest movie studios on the planet. We're thrilled to bring nearly 500 of their films to movie fans in the U.S. and Canada on YouTube and Google Play."

149.   In 2012, YouTube's online video store was a growing rental library that typically charged $2 to $4 per viewing. Prior to 2012, NBC Universal, Sony Pictures, Warner Bros., the Walt Disney Co. and many independent studios made deals to rent their latest releases through YouTube.

150.   Thus, it is clear Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios.

151.   20th Century Fox was the only major studio that had not signed with YouTube in 2012. Walt Disney acquired 21st Century Fox (successor) Company on March 20, 2019 for $71.3 billion dollars. Disney at the time was the world's largest media company and under contract with Defendant YouTube. This was the largest and perhaps most complicated acquisition of one media company to another in history.

152.   21st Century Fox, which was owned by media mogul Rupert Murdoch, included the 20th Century Fox, Fox Searchlight, Fox 2000, Blue Sky Animation film studios, The Fox News, Fox Sports Stations, FX Cable Stations, and National Geographic TV holdings along with a 30% share of Hulu (video) streaming and other international holdings. Disney already owned a 30% stake in Hulu. The deal made Disney, already the largest media conglomerate in the world, even larger making up nearly a third of the entertainment media landscape.

153.   In May of 2019, Sinclair Broadcast Group and the Walt Disney Company

closed a $9.6 billion dollar deal for Sinclair to buy 21 Fox Regional Sports Networks and Fox College Sports. The deal was announced in May after Disney bought the networks as part of its acquisition of Twenty-First Century Fox. Disney was required to divest the 21 regional sports networks as part of its acquisition of 21st Century Fox's film and TV assets in order to obtain clearance from the U.S. Department of Justice.

154.   On March 5, 2020, YouTube TV and Sinclair Broadcast Group reached a deal covering most of the Fox regional sports networks (RSNs). The deal between Google and Sinclair will keep 19 of the 21 Sinclair-owned Fox RSNs on YouTube TV through the end of the 2020 Major League Baseball season.

155.   Under the deal with Sinclair, YouTube TV will carry the following Fox-branded RSNs: Fox Sports Arizona, Fox Sports Carolinas, Fox Sports Detroit, Fox Sports Florida, Fox Sports Indiana, Fox Sports Kansas City, Fox Sports Midwest, Fox Sports New Orleans, Fox Sports North, Fox Sports Ohio, Fox Sportstime Ohio, Fox Sports Oklahoma, Fox Sports Prime Ticket (L.A.), Fox Sports San Diego, Fox Sports South, Fox Sports Southeast, Fox Sports Southwest, Fox Sports Sun, Fox Sports Tennessee, and Fox Sports Wisconsin.

156.   YouTube TV had over 2 million subscribers at the end of 2019, according to Defendant Google. YouTube TV doesn't bring YouTube videos to the TV. That's the duty of the free YouTube app. Instead, YouTube TV offers live TV, video-on-demand and a cloud-based DVR. YouTube TV just added improved integration with Android TV. Defendant Google owns YouTube and Android TV.

157.   The YouTube TV streaming service now includes 85-live TV channels

including: <u>ABC, CBS, Fox and NBC (with all four in 98% of U.S. markets), plus cable nets including ESPN, HGTV, TNT, AMC, Food Network, CNN and Fox News,</u> as well as content from the YouTube Originals channel.

158.    YouTube TV had one big competitive gap: the channels from ViacomCBS. That changed: Eight (8) ViacomCBS channels (BET, CMT, Comedy Central, MTV, Nickelodeon, Paramount Network, TV Land and VH1) were added to YouTube TV, with more mainstream channels being added soon.

159.    Thus, <u>Walt Disney buys 21st (successor to 20th) Century Fox for multi-billions, sells 21 Station affiliates to Sinclair Group,  only for (Defendant) YouTube TV to host 19 of the 21 channels sold by Disney, ...  under another multi-billion dollar ad and pay-per-view structured price scheme.</u>

160.    Defendant YouTube TV also touts its no-limits cloud DVR, which lets customers record an unlimited amount of programming that is available for nine months. YouTube TV allows up to six accounts per household, each with its own content recommendations and personal DVR. Customers can access the service on up to three devices simultaneously.

161.    As of 2020, <u>every major media outlet and major movie studio is now under contract with Defendant YouTube, or YouTube TV,</u> to either sell digital ads, movies, music, apps, news stories, and/or television shows.  Thus, it is clear <u>Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios.</u>

162.    This   unlawful, anti competitive conduct has and continues to net the

Defendants, and each of them, jointly and severally, multi-billion dollars in direct revenue and Adsense/AdSpend revenue. The facts as set forth above clearly demonstrate the <u>Defendants had no intentions of operating YouTube as an alternative to mainstream, major media, or movie studios.</u> In fact, it is clear Defendants had every intention of engaging in a unlawful conspiracy to engage in unlawful, anti-competitive conduct, as early as June 2007.

163.    Despite all this backdoor dealings and public maneuvering, the U.S. and multiple State Governments have failed to act, ... <u>or simply accepted campaign donations from the defendants and looked the other way.</u> The Defendants are  indeed more than a business: They are an unlawful cartel violating antitrust laws and abusing their complete market control and power. Further, Plaintiff negotiated in good faith and went to incredible lengths to keep all of his websites and YouTube channels. The Defendant's Google Adsense/AdSpend horizontal price-fixing scheme (standing alone, or in combination with Android OS, Google Search, etc..) is a classic act of a cartel misusing market power to achieve monopolistic cartel payments and generating anti competitive profits and complete control of the relevant market in the pursuit of anticompetitive payments. By forcing consumers to choose between paying those monopolistic cartel payments – which far exceed the marginal costs of operating an ad service, or lose the ability to reach the desired market, the Defendants place consumers in a Hobson's choice that all consumers of monopolistic goods and services face: pay up, way up, or lose.

164.    Oprah Winfrey's OWN network was added to YouTube TV in December 2020. The YouTube TV streaming service added 10 new channels, including: Discovery

Channel; HGTV; Food Network; TLC; Investigation Discovery; Animal Planet; Travel Channel; and MotorTrend on April 10, 2019, ... along with a $10.00 price hike.

165.   YouTube TV presently costs $65 per month, which reflects a $15 price hike that started on July 30, 2020. It was formerly $50 per month, after the April 10, 2019 price hike moved it up from $40.

166.   Hulu with 60% ownership by Walt Disney and with its Hulu Live TV just upped its price to $65 per month, but still offers 20 fewer channels than YouTube TV (though it's got its own exclusive original shows).

167.   Past price hikes were timed with content additions. When YouTube TV got Turner channels in 2018, it went up by $5, and the 2019 addition of local channels and Discovery channels saw a price jump of $10.

168.   Defendants' conduct in creating, supporting and approving the Google Adsense PPC horizontal price fixing scheme is also premised upon a fluctuating policy on the types of content that is eligible to be monetized with advertising, or who can monetize content, or websites. The Defendants have collectively acted to increase the prices paid by advertisers for the ability to host an online news feed, digital ads to sums that far exceed the prices any advertiser would have to pay in a competitive online news, or digital ad market, or online marketplace.

169.   Specifically, the Defendants met and agreed collusively to impose the Google AdSpend/Adsense PPC fees in meetings dating back to 2003. As a collective, the Defendants, and each of them, jointly and severally, leveraged their monopoly position as the sole major Internet (Search) browser,  online news feed providers, digital ad, App

providers and online sales businesses in the United States, … and all tied in with their Android OS. The antitrust laws, and the laws regarding contracts, were adopted to prevent this exact kind of economic bullying and ensure a competitive marketing system.

170.   In a competitive marketplace, Defendants could not command, nor demand multi-billion dollar annual ad revenues; instead, they could only seek the market rates consistent with the market brand and relevant market. However, the Defendants are anything but a competitive market. Once again, in a country with over 325 million citizens, the Defendants, jointly and severally currently control 98% of the U.S. Internet market(s). The Internet is its own market. For an App developer, online content creator, website designer, advertiser, or consumer, the Defendants, Facebook, Google and Amazon are the only businesses in town.

171.   Because of the complete control that the Defendants have over the Internet market, demand for online products are effectively inelastic: i.e., the value of higher online prices far exceeds any reduction in demand caused by the higher prices, in part because demand is generally well above the "brick market," so even if some existing consumers choose not to purchase Defendants' online products, others are eager to buy. In short, digital advertisers have to pay anti competitive prices if they want to advertise online and, if they cannot, they simply cannot advertise. No one business could demand these anti competitive prices alone; indeed, 98% control of the vast Internet Market requires the collective effort of all the Defendants. As the United States Court of Appeals for the Second Circuit has recognized, such industry-wide agreements tend to "stiffen the spines" of otherwise competing interests. U.S. v. Apple, 791 F.3d 290, 305 (2d Cir.

2015). By acting in concert – in an agreement in violation of Section 1 of the Sherman Act – Facebook, Google and Amazon "stiffen" their "spines" to ensure that each of the Defendants demand the same of the online consumer and use the same platforms (Facebook, Instagram, Twitter, Amazon, AdSpend/Adsense, Android OS, Google Play, Google Search, YouTube, etc.).

**C.      The Relevant Market Applicable To Defendants' Misconduct**

172.    The relevant market in this action is the Internet market, which spans the United States and all consumers, advertisers, website designers, content creators, cities and communities that are willing to utilize the Internet for online news feeds and to purchase goods (music, news, videos, movies, electronic accessories, software) and services in the geographic United States. There are multiple barriers that prohibit entry into this market.

173.    With respect to the product market, as alleged above, there is no substitute for Internet marketing, online news feeds, digital advertising, online movies, videos, music, global news feeds, or Apps. There is no other competitive search engine (key word) Internet market in the United States. The Yahoo search engine is no substitute for the Google, Amazon, or Facebook cartel. Even to the extent Yahoo has made limited attempts to enter the United States search engine  (key word) Internet market as a competitor, those efforts failed.

174.    Marissa Mayer joined Defendant Google in 1999 as employee number 20. She started out writing code and overseeing small teams of engineers, developing and designing Defendant Google's search offerings. She became known for her attention to

detail, which helped land her a promotion to product manager, and later she became director of consumer web products. She oversaw the layout of Defendant Google's well-known, unadorned search homepage. She was also on the three-person team responsible for Google AdWords, which is an advertising platform that allows businesses to show their product to relevant potential customers based on their search terms. AdWords helped deliver 96% of the company's revenue in the first quarter of 2011. Mayer was the vice president of Google Search Products and User Experience until the end of 2010, when she was asked by then-CEO Eric Schmidt to head the Local, Maps, and Location Services. In 2011, she secured Google's acquisition of survey site Zagat for $125 million. On July 16, 2012, Mayer was appointed president and CEO of Yahoo!, effective the following day.

175.    In 2015, Verizon expanded into content ownership by acquiring AOL. AOL and Yahoo were amalgamated into a new division formerly named Oath Inc., currently known as Verizon Media. In 2017, Verizon acquired Yahoo!.  It was announced in January 2017 that Mayer would step down from the company's board upon the sale of Yahoo!'s operating business to Verizon Communications for $4.8 billion dollars. Mayer announced her resignation on June 13, 2017.

176.    Yahoo! owns a 20% stake in the Chinese e-commerce company Alibaba Group (after selling 20%). Alibaba was set up in 1999 and operates retail, business-to-business and consumer-to-consumer platforms. It has expanded at a breakneck pace into digital advertising, financial services, film production and other fields. Alibaba's founder, Jack Ma, is China's richest entrepreneur and one of its most

prominent business people worldwide with a net worth of $59 billion. China has the world's biggest population of internet users at 940 million. Alibaba said revenue rose 30% over a year earlier in the three months ending in September to 155.1 billion yuan ($23.4 billion dollars). Alibaba said shoppers spent 498.2 billion yuan ($75.1 billion dollars) on its online platforms from Nov. 1, 2020 to November 11, 2020, during the Singles Day shopping festival. The informal holiday begun in the 1990s has become the world's biggest retail spending period. Alibaba Group is the 4th largest digital (PPC) advertiser after Defendants Google, Facebook and Amazon.

177.    Mayer essentially structured the Yahoo! Search engine, or browser, as a market host for Defendant Google's products, including: Apps, digital ads, movies, music, apps, online news feeds, and/or television shows.

178.    In 2019, Defendant Google, dba, YouTube TV and Verizon Media partnered up to make YouTube TV available on Verizon Wireless Android Phones (with a 30-day free trial of YouTube TV).

179.    The Internet market is a unique market. The Defendants wholly control the process of establishing websites, operating systems, search engines, App development advertising protocols, their locations, and monetization of the foregoing, if allowed by Defendants. If an App developer, website designer, content creator, advertiser, or a potential website designer, content creator, advertiser, does not abide by the process controlled by Defendants, then they stand to lose their online website, franchise or not get selected as a business capable of monetization. These website designers, content creators, and advertisers cannot go elsewhere. Defendants Google, Facebook and Amazon own all

advertising platforms, … as well as the Android OS that is required to participate in App development, online news feeds, digital advertising, or online sales. Traditional advertising is not a substitute for an online news feed, online sales franchise, or a digital advertising platform.

180.   With respect to the geographic market, the vast majority of demand for Internet Advertising, sales and online news feeds is in the United States, and the Defendant companies are located in the United States. Despite some Internet Advertising and online sales abroad, no Defendant has based itself in a foreign city, and at the time of the anti-competitive conduct alleged herein, the United States market dominated Internet Advertising and online sales, and there was no substitute outside of the United States.

181.   Thus, the Defendants have leveraged their Internet Search Browser and Android OS monopoly, to obtain a monopoly in the U.S. market for website designers, content creators, and advertisers, news feeds, as well as for Internet Advertising and online sales.

**D.   Defendants' Conduct Has Injured Competition**

182.   In a competitive market, actual and potential app developers, website designers, content creators, and advertisers (often with investing private interests) could build or renovate webpages, or platforms for the purposes of hosting online news feeds, Internet Advertising and online sales, and they would be able to compete to host an online enterprise on a level playing field. However, the Defendants have complete control over the Internet, the Android OS, online news feeds, Internet Advertising and online sales; and the Defendants have agreed to strictly limit the number and location of online

companies to maintain that power. Thus, even if a website designers, content creators, and advertisers and/or private investors built a new Internet platform and had the capital and infrastructure to operate an online news feed, digital advertising franchise, they could not do so without Defendant's permission and the requisite cartel payments to Defendants through the AdSpend/Adsense horizontal price fixing scheme.

183.   As a result of the artificially restricted supply in the market of Internet Advertising and online sales, Defendants have caused excess demand among actual and potential website designers, content creators, and advertisers and/or private investors for an online news feed, digital advertising or Internet sales franchise. Defendants then capitalize on their complete market power by charging supra-competitive prices to participate in the market. Those who will not pay are shadow banned, banned through termination of websites, or have their websites and channels demonetized.

184.   As a result of Defendants' conduct, many actual or potential participants cannot realistically participate in the online news feed, digital advertising or Internet sales franchise market even though there is, or would be, considerable interest in their communities in hosting an online franchise. The market has been limited to Facebook, Google and Amazon and to the small number of affiliate companies willing to meet Defendants' supra-competitive demands.

**E.       Defendants' Anticompetitive Conduct Has Injured Plaintiff**

185.   The Defendants consciously joined and participated in the conspiracy by violating the antitrust laws, supporting and approving the AdSpend/Adsense horizontal price fixing scheme (including but not limited to software support and collecting support

fees), demonetizing, shadow banning and terminating Plaintiff's websites and YouTube channels as a competitor for an online news feed, digital advertising and/or sales franchise. Such collusive conduct has been enormously injurious to Plaintiff.

186.   Among other damages, Plaintiff has invested ten (10) years labor, the marketing of YouTube, Facebook, Twitter and Blogger over 10 years and  significant sums of money, totaling over $1 million, in reliance on the Defendants Advertising and Online sales Policies; and on the Plaintiff's Brand presence within the Google, Facebook, YouTube portfolio of platforms. Further, Plaintiff has lost significant income, in the minimum amount of $1 billion dollars a year (2008-2018) that he derived from Plaintiff's Brand presence within the Google, Facebook, YouTube portfolio of platforms as well as the economic activity Plaintiff's brand presence generates. In addition, Plaintiff now owns a Facebook, YouTube, Google blogspot and Twitter account that has been shadow banned, demonetized and terminated by the Defendants and, thus, has incurred the significant diminution in property value caused by that shadow ban, demonetization and termination.

187.   All of these losses and injuries are directly related to, and caused by, the anticompetitive conduct of Defendants, including their contract, combination, or conspiracy in the restraint of trade and interstate commerce, and their resulting breach of the AdSpend/Adsense contract as outlined and formulated by the Defendants.

## VIII.   THE NEED FOR PRELIMINARY RELIEF

188.   In the absence of preliminary relief, consumers will be deprived of their choice of Apps, browsers, operating systems, online news feeds, digital advertising, sales

franchises and consumers and the public will be deprived of the benefits of competition during the pendency of this action. Relief at the conclusion of this case cannot remedy the damage done to consumers and the public during the interim.

189.    In addition, the damage to competitors and competition during the pendency of this case that would occur in the absence of preliminary relief cannot practically be reversed later.

190.    Aided by Defendants' anticompetitive conduct, Google's share of the relevant market and product market has increased dramatically in the top 100 U.S. markets, reaching over 85% of U.S. consumers, an increase from 18% in 2006; Consumers spent $5.1 billion online (on Facebook, Google and Amazon products) on Thanksgiving Day 2020 alone. Spending is up 21.5% from last year (2019). Nearly 50% of the web-based purchases were made on an android smartphone. In the absence of interim relief, Defendants' share of the browsers, operating systems, online news feeds, digital advertising, and sales franchises market will grow substantially as a result, among other things, of Google's tying of its Internet browser to the Android OS and other anti competitive practices.

191.    Defendants' App, browser, operating systems, online news feeds, digital advertising, and sales franchise market competitors will be effectively foreclosed from important opportunities to supply alternative browsers, operating systems, online news feeds, digital advertising, and sales franchise markets to customers so long as the tie-in and Defendants' other exclusionary practices continue. In particular, due to the market's network effects, the significant increase in Defendants' share of the App, browser,

operating system, online news feeds, digital advertising, and sales franchise markets that will result in the absence of preliminary relief will tip the market in favor of the Defendants and accelerate its dominance and competition's demise.

192.   In addition, the barriers that exist to the entry of new competitors, or the expansion of smaller existing competitors, including network effects, mean that dominance once achieved cannot readily be reversed.

193.   In the absence of preliminary relief, the increase in each Defendant's position that will result from its continuing illegal conduct will so entrench it (and so weaken its competitors) that the cost of reversing the Defendants' imminent domination of the Internet browser, operating system, online news feeds, digital advertising, and sales franchise markets "could be prohibitive." See United States v. Microsoft Corporation, 980 F. Supp. 537, 544 (D.D.C. 1997).

## IX.    CAUSES OF ACTION

### COUNT I:  Violation of the Sherman Act (15 U.S.C. § 1)

### Shadow Banning: Damages/Disgorgement

194.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

195.   The Defendants, jointly and severally have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers and/or private investors to maintain and sponsor an online news feed, digital advertising, or

online sales franchise at competitive prices.

196.    Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers –   like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online news feeds, online sales franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales franchise, as evidenced by the Defendants' shadow banning of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' shadow ban of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host online news feeds, digital advertising, or online sales franchises in the future. In a competitive marketplace, Defendants could not have successfully demanded these monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

197.    Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a shadow ban.

198.    Defendants' shadow ban constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear

objective of Defendants' misconduct is to limit the number of competitive online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits, by providing shadow banning competitive websites and platforms to collect exorbitant advertising fees, and monopolistic fees paid by wealthier media corporations. Third, Defendants' shadow ban is not necessary for the production of online news feeds, digital advertising, online sales franchises, or the achievement of any pro-competitive business objective.

199.   Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

200.   As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

201.   Further, Defendants' unlawful shadow ban has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including shadow banning, or group boycotts), demands that these illicit profits be disgorged.

202.   Accordingly, Plaintiff is entitled to a judgment of damages against the

Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

203.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

**COUNT II: Violation of the Sherman Act (15 U.S.C. § 1)**

**Demonetization: Damages/Disgorgement**

204.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

205.   There is a relevant market for the hosting of online news feeds, digital advertising, or online sales franchises in the United States, as alleged above.

206.   Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers to maintain and/own an online news feeds, digital advertising, or online sales franchises at competitive prices.

207.   Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online

news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers –   like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales franchise, as evidenced by the Defendants' demonetization of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' demonetization of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host online news feeds, digital advertising, or online sales franchises in the future. In a competitive marketplace, Defendants could not have successfully demonetized Plaintiff's websites and YouTube channels, or demanded monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

208.    Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a concerted demonetization of Plaintiff's YouTube channels and websites (or a refusal to deal).

209.    Defendants' concerted demonetization of Plaintiff's YouTube channels and websites constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear objective of Defendants' misconduct is to limit the number of competitive online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits, by demonetizing competitive platforms to collect exorbitant advertising fees, and monopolistic fees paid

by wealthier media corporations. Third, Defendants' concerted demonetization of Plaintiff's YouTube channels and websites is not necessary for the production of online news feeds, digital advertising, online sales franchises, or the achievement of any pro-competitive business objective.

210.   As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

211.   Further, Defendants' unlawful concerted demonetization of Plaintiff's YouTube channels and websites has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including concerted demonetization), demands that these illicit profits be disgorged.

212.   Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

213.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

**COUNT III: Violation of the Sherman Act (15 U.S.C. § 1)**

**Termination of Websites/Channels: Damages/Disgorgement**

214.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

215.   There is a relevant market for the hosting of online news feeds, digital advertising, or online sales franchises in the United States, as alleged above.

216.   Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers to maintain and/own an online news feeds, digital advertising, or online sales franchises at competitive prices.

217.   Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers —   like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online news feeds, online franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales

franchise, as evidenced by the Defendants' termination of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' termination of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host an online news feed, digital advertising, or online sales franchises in the future. In a competitive marketplace, Defendants could not have successfully terminated Plaintiff's websites and YouTube channels, or demanded monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

218.   Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a termination of Plaintiff's YouTube channels and websites.

219.   Defendants' termination of Plaintiff's YouTube channels and websites constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear objective of Defendants' misconduct is to limit the number of competitive online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits, by terminating competitive platforms to collect exorbitant advertising fees, and monopolistic fees paid by wealthier media corporations. Third, Defendants' termination of Plaintiff's YouTube channels and websites is not necessary for the production of online news feeds, online sales franchises, online digital advertising, or the achievement of any pro-competitive business objective.

220.   Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

221.   As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

222.   Further, Defendants' unlawful termination of Plaintiff's YouTube channels and websites has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including termination of YouTube channels and websites), demands that these illicit profits be disgorged.

223.   Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

224.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

### COUNT IV: Violation of the Sherman Act (15 U.S.C. § 1)

### Price Fixing: Damages/Disgorgement

225.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

226.   There is a relevant market for the hosting of online news feeds, digital advertising, or online sales franchises in the United States, as alleged above.

227.   Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other website designers, content creators, and advertisers to maintain and/own an online news feeds, digital advertising, or online sales franchises at competitive prices.

228.   Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anti competitive prices and complete control for hosting of online news feeds, digital advertising, or online sales franchise by offering Plaintiff and other website designers, content creators, and advertisers and/or private investors a Hobson's choice: pay the enormous demands associated with online news feeds, digital advertising, or online sales franchise, or lose your website, or ability to advertise online. These demands have forced website designers, content creators, and advertisers –   like Plaintiff, that will not pay the supra-competitive price of the Defendants demands for hosting online news feeds, sales franchises, or digital advertising – out of the market for online news feeds, digital advertising, or online sales franchise, as evidenced by the Defendants' termination of Plaintiff's websites and YouTube channels. Indeed, as a result of Defendants' termination of Plaintiff's websites and YouTube channels, Plaintiff lost not only the revenue, the channels and websites, but also any chance to host online news feeds, digital advertising, or online sales franchises in the

future. In a competitive marketplace, Defendants could not have successfully terminated Plaintiff's websites and YouTube channels, or demanded monopolistic terms, conditions, or payments; and the Plaintiff would still be online hosting advertising, music, movies and news feeds.

229.   Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a horizontal price fixing scheme.

230.   Defendants' horizontal price fixing scheme constitutes an unreasonable restraint of trade. First, Defendants have complete control over the Internet and their platforms. Second, the clear objective of Defendants' misconduct is to limit the number of competitive App developers, online news feeds, digital advertising, or online sales franchises and to increase Defendants' profits through the artificially inflated and monopolistic fees paid by wealthier media corporations. Third, Defendants' horizontal price fixing scheme is not necessary for the production of Apps, online news feeds, digital advertising, online sales franchises, or the achievement of any pro-competitive business objective.

231.   Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

232.   As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the loss of his websites and YouTube channels and the economic activity generated by Plaintiff's brand presence within the Google, Facebook, YouTube portfolio of platforms. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

233.   Further, Defendants' unlawful horizontal price fixing scheme has resulted in enormous profits for each of the Defendants, including monetary concessions from media corporations and inflated advertising revenue enjoyed by the Defendants, and all other media corporations sharing in the Adsense PPC advertising fees assessed on the Plaintiff. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including horizontal price fixing schemes), demands that these illicit profits be disgorged.

234.   Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in a minimum amount of $10 Billion Dollars ($1BN for each year 2008-2018) or in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of his damages.

235.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

**COUNT V:  Violation of the Sherman Act (15 U.S.C. § 1)**

**Exclusive Dealing and Other Exclusionary Agreements**

236.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

237.   Google's agreements with ISPs, ICPs, and others pursuant to which such companies agree not to license, distribute, or promote non-Google, Facebook, or Amazon products (or to do so only on terms that materially disadvantage such products), and its agreements with OEMs restricting modification or customization of the Android OS, Apps and the PC/tablet/Android Smartphone boot-up sequence and screens, unreasonably

restrict competition and thus violate Section 1 of the Sherman Act. These agreements unreasonably restrain trade and restrict the access of Defendants' competitors to significant channels of distribution, thereby restraining competition in the Internet browser market, among other markets.

238.   The purpose and effect of these agreements are to restrain trade and competition in the Internet browser, operating system, online news feeds, digital advertising, Apps and sales franchise markets. These agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

239.   After the commencement of the United States' Congressional investigation of Defendants' exclusionary agreements, the Defendants modified certain of those agreements. However, the continuing anticompetitive effects of the agreements are substantial; the modified agreements are themselves anticompetitive and there is a serious threat that, unless enjoined, the Defendants will reimpose the unlawful terms that they have only recently expressed an intention not to enforce.

**COUNT VI: Violation of the Sherman Act (15 U.S.C. § 1, & 2)**

**Unlawful Tying**

240.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

241.   The Android operating systems, Apps and Google's, Amazon's and Facebook's Internet browser software are separate products. They are sold in different markets; their functions are different; there is separate demand for them; and they are treated by the Defendants and by other industry participants as separate products. It is

efficient for Defendants not to tie them and/or to permit OEMs to distribute Android without Google, Amazon's and Facebook's Internet browser software, or Apps.

242.   Defendant Google, for the benefit of each Defendant, jointly and severally, has tied and plans again to tie its Internet browser to its separate Android operating system, which has monopoly power, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, & 2.

243.   The purpose and the effect of this tying are to prevent customers from choosing among Internet browsers, Apps, or operating systems on their merits and to foreclose competing browsers, Apps, or operating systems from an important channel of distribution, thereby restraining competition in the Internet browser market.

**COUNT VII: Violation of the Sherman Act (15 U.S.C. § 1)**

**<u>Horizontal Market-Division Agreements:</u> Equitable Relief**

244.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

245.   The Defendants' Horizontal Market Agreement consists of Defendants' agreement to use the Google AdSpend/Adsense, pay-per-click, advertising protocol and the Android OS. The Defendants' Horizontal Market Agreement constitutes a per se illegal market allocation and price-fixing agreement designed to eliminate competition between the Defendants for operating systems, digital advertising, the sale of online goods and services, the nature and effect of which is to is to allocate the markets to the Defendants, to give the Defendants the ability to fix the prices of operating systems, digital advertising, the sale of online goods and services, and to permit the Defendants to

control the future of online markets, and enable the elimination of, competitor products.

246.   Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants' products are the principal competitive products to each other's own dynamic control system design software (Android OS), the overall effect of the Horizontal Market Agreement is to eliminate the competition between Defendants in the three relevant markets (online sales, digital advertising and Operating Systems). Consumers are harmed both by the elimination of the Defendants' products as a competitive alternative to each other's products. The competition between the Defendants' products provided Defendants an incentive to facilitate interoperation with third-party products, as an unwillingness by one to do so would likely advantage the other.

247.   Each of the Defendants cooperated with a small number of companies to facilitate interfaces between Defendants' products and those companies' products that compete with Defendants' products in the individual markets.

248.   Defendants' Horizontal Market Agreement was not designed to, nor had the effect of, increasing economic efficiency or rendering the markets more competitive. As a consequence of the elimination of competition resulting from the Horizontal Market Agreement, the Defendants will have less incentive to provide such technical cooperation to competitors selling only individual products, thus further reducing competition for consumers who value integrated products.

249.   In the alternative, the Horizontal Market Agreement has resulted in anticompetitive effects in the online sales, digital advertising and Operating Systems